**CLAYTON BROKERAGE COMPANY OF ST. LOUIS, INC., Appellant,**

**v.**

**Roy W. MOUER, Securities Commissioner of Texas, Appellee.**

**No. 12198.**

Court of Civil Appeals of Texas, Austin.

Feb. 26, 1975.

Rehearing Denied March 19, 1975.

Robert C. Cheek, Tobolowsky, Schlinger & Blalock, Dallas, for appellant.

John L. Hill, Atty. Gen., David W. Pace, Asst. Atty. Gen., Austin, for appellee.

PHILLIPS, Chief Justice.

The basic issue in this case is whether the trial court erred in holding that London options, as brokered by appellant, Clayton Brokerage Company of St. Louis,

Inc., are securities. We think not, consequently, we affirm its judgment.

The trial below was to the court sitting without a jury and was an appeal from a ruling of the Securities Commissioner of the State of Texas that a London option as hereinafter described is a security. It is appellant's basic contention that there is no evidence, therefore insufficient evidence, that a London option is a security, and that, in fact the evidence shows that a London option is not a security. The trial court below correctly held that the Securities Commissioner had the burden of proof to prove by a preponderance of the evidence that a London option is a security. There is no presumption in favor of the Commissioner's findings and the test is not whether the Commissioner's findings are supported by substantial evidence.

## I.

A London option is a right, for a price, to purchase or sell a commodity futures contract for a specified term at a specified price. Thus it is simply an extension of a commodity futures contract and is traded on the same London commodity exchanges as the underlying futures contract. Appellant deals in both London commodity options and London commodity futures contracts in the world commodities which include sugar, cocoa, coffee, rubber, silver and copper.

For a basic understanding of the facts of this case we must first define "futures contracts." These contracts are so named because they require delivery of a commodity in a stated month in the future —if not liquidated before the contract reaches maturity.[1] A futures contract is a present right to receive at a future date a specific quantity of a given commodity for a fixed price. Futures markets do not involve face-to-face negotiations between the buyer and seller of the futures contract. Instead, brokers act somewhat as agents, meeting on the floor of a recognized commodity exchange or in some other manner where the terms, such as price, are negotiated. Months of delivery are standardized by the particular exchange on which the futures contracts are traded.

Appellant, a Missouri corporation with principal offices in Clayton, Missouri, has been engaged in the commodities brokerage business since 1953. Its operations are currently conducted through a network of twenty-nine retail branch offices located throughout the United States. In Texas it has branch offices in Dallas, Houston, San Antonio and Austin.

Appellant is a member of principal commodity exchanges in the United States, including the Chicago Board of Trade, Chicago Mercantile Exchange, and deals in commodity futures contracts in the so-called "regulated commodities" (commodities regulated under Section 2(a) of the Commodity Exchange Act, 7 U.S.C.A. § 2) on these exchanges. There are numerous "nonregulated" commodities, commonly referred to as "world commodities," that are extensively traded over which Congress chose not to exercise any regulatory restraints (7 U.S.C.A. § 2). The London options at issue in this case involve the world commodities traded in the London futures markets, such as sugar, coffee, cocoa, rubber and most of the metals. Appellant is also a member of principal commodity exchanges in London. Drexel-Burnham & Co., Inc., is one of appellant's brokers that executes the orders of appellant's customers for London options and futures contracts on the London commodity exchanges.

Futures markets operate in the commodity exchanges through "certificateless trading." Unlike transactions on security exchanges, where the buyer receives evidence of his transaction in the form of a stock certificate, a transaction on a commodities

1. See: Campbell, Trading in Futures Under the Commodity Exchange Act, 26 G.Wash.L.Review 215 (1957).

exchange does not culminate in the purchaser receiving a "certificate" for his futures contract. He receives only evidence of his purchase, a confirmation of the transaction and an invoice calling for payment. There is room in the commodity market not only for a person who uses the futures market for the purpose of obtaining a kind of economic insurance in business operations by actually knowing the price he will have to pay for his raw material, but also for the speculator who trades in the market for profit and not with a view for the use of the commodity in his business.

The rules of the London commodities exchanges require that the grantor of an option have sufficient funds so that the purchaser or taker is assured, should he decide to exercise his option, the grantor will deliver to him the futures contract underlying the option. For the purpose of this opinion it is assumed that the customer purchased a call option, i. e., an option to buy a futures contract. The customer exercises the option if it is desirable for him to do so, that is, if the price of the underlying commodities futures contract rises appreciably above the specified price. He takes his profit by first taking an offsetting position. He does this by selling a futures contract for the same commodity for the same delivery month at a higher current price. Then he exercises his option and thereby holds the futures contract from the grantor at the lower specified price agreed to when the option was purchased. As a result of holding two offset-ting positions, the respective clearing house automatically closes both positions and a profit results. The profit is the difference between the specified price or "striking price" and the higher market price minus commissions. If the market price of the underlying futures contract does not rise above the specified price, the customer does not exercise his option, and his loss is the price of the option plus commission. Thus it is a conservative method of speculating in the commodity futures market because the customer does not have the potential liability he would have if he purchased a futures contract.

Appellant is also in the business of selling "put options" and "double options" which, for the purposes of this opinion need not be described.

## II.

Pursuant to a hearing held before the Securities Commissioner on November 1, 1973, the Commissioner held that the options described by appellant at the hearing are securities within the meaning of Section 4.A[2] of the Securities Act, Article 581, Vernon's Ann.Civil Statutes, in that they constitute "investment contracts," "evidence of indebtedness" and "certificates or instruments representing an interest in the capital, property and assets of the grantor of the option, and of any guarantor of the option."

As stated above, the decision of the Commissioner was appealed to the Travis

2. "A. The term 'security' or 'securities' shall include any share, stock, treasury stock, stock certificate under a voting trust agreement, collateral trust certificate, equipment trust certificate, preorganization certificate or receipt, subscription or reorganization certificate, note, bond, debenture, mortgage certificate or other evidence of indebtedness, any form of commercial paper, certificate in or under a profit sharing or participation agreement, certificate or any instrument representing any interest in or under an oil, gas or mining lease, fee or title, or any certificate or instrument representing or secured by an interest in any or all of the capital, prop-erty, assets, profits or earnings of any company, investment contract, or any other instrument commonly known as a security, whether similar to those herein referred to or not. Provided, however, that this definition shall not apply to any insurance policy, endowment policy, annuity contract, optional annuity contract, or any contract or agreement in relation to and in consequence of any such policy or contract, issued by an insurance company subject to the supervision or control of the Board of Insurance Commissioners when the form of such policy or contract has been duly filed with the Board as now or hereafter required by law."

County district court where after a trial *de novo,* the court held that the London options were securities under the Securities Act. The court filed findings of fact and conclusions of law to which appellant has taken exception and form the basis of twenty-eight points of error now before us.

### III.

The Securities Commissioner found that the enterprise entered into between appellant and the purchaser of the so-called London option is an "investment contract" within the meaning of Sec. 4 subd. A of Article 581, V.C.S.

■ In S.E.C. v. W. J. Howey Company, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946) the Supreme Court of the United States defined an investment contract for the purpose of the Federal Securities Act [3] to be a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter, or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise.

Appellant contends that there is no evidence before the Court, consequently, insufficient evidence of the elements that would constitute an "investment contract."

Applying the *Howey* test for an investment contract we must first ascertain whether appellant's scheme involves a "common enterprise." Appellant maintains that there is no common enterprise as each customer chooses his own commodity, the amount of premiums he is willing to pay to purchase the option, the striking price (the price at which he can purchase the underlying futures contract), the length of time the option is to run and the delivery month of the under-

lying futures contract. It maintains that every time a customer in, let us say, Dallas, purchases a London option through appellant, this offer is relayed to London through appellant's broker Drexel-Burnham. The actual purchase of the option is through the services of the London commodity exchanges by a representative of Drexel-Burnham. When a customer asks appellant to act as a broker in the purchase of a London option, a specific London option is purchased through the services of one of the various commodity exchanges in London. This option gives the customer the right to exercise the option and thereby buy a specific commodity futures contract at a specific price from the grantor of the option during the term of the option.

■ Appellant insists that just as in the case of futures contracts, which have never been held to be securities, Sinva v. Merrill Lynch, Pierce, Fenner & Smith, 253 F.Supp. 359 (S.D.N.Y.1966), each of appellant's customers purchases his option separately from other customers; he is not investing in appellant and the success of his purchase is not related to appellant's success; neither is his profit related to the success of other customers, nor do the customers have anything in common with each other except that they have chosen the same agent to make their purchases. The success instead is related to the fluctuating market price of the chosen commodity exactly as if he had purchased a futures contract.

Should this be the case, appellant would be correct in his position; however, the facts disclose certain divergencies from those argued by appellant that predispose us to agree with the inferences that the trial court drew therefrom.

■ The basic reason for appellant's existence, as found by the trial court, is that investors in London options who place

---

3. The definition of the Texas Securities Act is identical to the Federal Securities Act of 1933 (15 U.S.C., Sec. 77b(1) (1970) and the Securities and Exchange Act of 1934) (15 U.S.C., Sec. 78c(a)(10).

their money with appellant expect a profit from its employment. A common enterprise is one in which the fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment of third parties. Los Angeles Trust Deed and Mortgage Exchange v. S.E.C., 285 F.2d 162 (9th Cir. 1961), cert. denied, 366 U.S. 919, 81 S.Ct. 1095, 6 L.Ed.2d 241 (1961). This element of commonality is between the investor and promoter (appellant), and not between investors similarly situated. Maheu v. Reynolds and Company, 282 F.Supp. 423 (S.D.N.Y.1968). Nor does the existence of a security necessarily depend upon an investor's owning an interest in the enterprise as a whole. In S.E.C. v. Joiner Leasing Corp., 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943), the Supreme Court held that a security existed where each investor was sold a specific acreage interest in oil leases not owned in common with other investors or promoters. The profit expected by each individual investor was the appreciation in market price of his individual acreage, enhanced by the promoter's promise to drill an exploration well. The Court described common enterprise as follows: "The exploration enterprise was woven into these leaseholds, in both an economic and a legal sense; the undertaking to drill a well runs through the whole transaction as the thread on which everybody's beads were strung." For a similar holding see Los Angeles Trust Deed and Mortgage Exchange v. S.E.C., *supra,* which involved interest payments on notes secured by *individual* deeds of trust.

There is sufficient evidence in the record before us to show that the financial fortunes of appellant's option investors are interwoven with and dependent upon the efforts and success of appellant.

Under appellant's plan of business, "premiums" paid by investors for the purchase of London options are co-mingled in various accounts of appellant. The resulting pool of funds is transferred and utilized by appellant in its sole discretion for the purpose of paying administrative expenses, including salaries, honoring profits due investors, and investing for its own account. Appellant uses the pooled funds of investors to purchase commodity options on London exchanges, but not for the account of specific investors. It is undisputed that appellant's investors do not know that the options are not purchased in their name. Investors do not know who the grantor of an option is. Investors' names are known only to appellant. Options are issued by London grantors to Drexel-Burnham, a London/New York brokerage firm which considers its customer to be appellant and not appellant's investor. London grantors do not issue options in the names of appellant's investors. Appellant's argument that it acts as a broker of options is not supported by the evidence. For the definition of a broker see 12 C.J.S. Brokers § 22, 41 (at pages 65, 96, and 97); also see Duncan v. Stevenson, 120 S.W.2d 305 (Tex.Civ. App.1938, no writ).

Unknown to investors appellant purchases London options in its own name. When an exercise is requested by the investor, appellant does not immediately forward the order to Drexel-Burnham, rather, it computes and pays the investor's profit itself. Since there has been no actual exercise, the London option is retained in appellant's name with Drexel-Burnham, notwithstanding appellant's argument that options belong to customers. Appellant's actions result in an interweaving of financial fortunes whereby its ability to meet its obligations to investors is dependent upon its success and efforts in managing its option trading accounts.

Another aspect of interweaving of financial fortunes involves appellant's parent corporation, Garnac Grain. Appellant is a wholly owned subsidiary of Garnac. Garnac is one of appellant's largest unregulated commodity customers. Over 95% of appellant's option sales are "call" options. When a futures contract is offset by a call option in the Drexel-Burnham omnibus account through which appellant trades, no

margin is required of the futures contract purchaser. Thus when a Garnac futures contract order is offset in the pool of orders by another customer's call option, in many instances Garnac does not have to put up margin for its purchase. In addition, the commission paid by a customer is split between Drexel-Burnham and appellant (Garnac's subsidiary). It is this close interweaving of mutual economic fortunes which constitutes the common enterprise into which appellant's customers are encouraged to invest.

In King Commodity Company of Texas, Inc. v. State, 508 S.W.2d 439 (Tex.Civ. App.1974, no writ), under a set of facts very similar to those at bar, the Dallas Court of Civil Appeals held that commodity options are securities subject to registration under the Texas Securities Act. The Court affirmed the trial court's presumed finding of common enterprise. See 1 Louis Loss, Securities Regulations, at 489 (2d ed. 1961); Note, Securities Regulation of Pyramid Schemes, 51 Texas L.Rev. 788 (1973).

■ With respect to the first part of the *Howey* test, appellant has carried its burden of proving a common enterprise: (1) a co-mingling of investor funds which appellant transfers and utilizes in its sole discretion to pay administrative expenses, honors profits due investors and invests for its own account; (2) a relationship in which appellant supplies investment counseling and expresses views on prospective price changes to inexperienced investors in such a manner that the fortuity of the investments collectively and the success of each individual investment is essentially dependent upon appellant's efforts and special experience.

■ Thus we come to the second requirement of the *Howey* test, i. e., that the investor be led to expect profits solely from the efforts of the promoter or a third party. Appellant attacks the quantum of

evidence necessary to sustain the trial court's finding which was in the affirmative. We hold that the evidence is sufficient to affirm the court in this regard.

In *Howey*, the Court found an investment contract under the following circumstances: each prospective customer of the Howey Company was offered both a land sales contract on a tract of citrus acreage, calling for installment payments of the purchase price, and a ten-year, noncancellable service contract running in favor of the Howey Company which granted the company a ten-year leasehold interest in and "full and complete possession" of the acreage. The service contract gave the Howey Company full discretion and authority over the cultivation of the citrus groves and the harvest and marketing of the crops. The tracts purchased by the customers were not separately fenced and there was, ordinarily, no right to specific fruit. While using the adverb "solely" to modify the expectation of profits from the efforts of a third party, the Court goes to great length to clarify its holding by stating that form should be disregarded for substance with emphasis to be placed on economic reality. The Court stated that its test embodies a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of money of others on the promise of profit." Thus it seems highly unlikely that, as has been suggested, the Court would have found no security in *Howey* had each purchaser been required to pick one orange from his own grove.[4]

When appellant's scheme, which is commonly known in the trade as a discretionary account, is viewed from its four corners, it becomes clear that it is managed and supervised solely by appellant. This is so even though appellant's customers may have the legal right to participate in appellant's commodity trading. The facts of the case demonstrate that they do not.

4. See Note, 51 Texas L.Rev., *supra.*

Appellant solicits investment customers who are not familiar with commodity trading. These persons do not understand commodity options; they do not know in whose name an option is purchased or from whom. All customers do believe that an option has been purchased in their individual names; they do not know who actually purchases the option they have ordered; and they do not know how to exercise an option or take a profit from their investment.

Customers frankly admitted at trial that they made no contribution whatsoever toward making their investment with appellant profitable. They looked to appellant for their profit.

Customers understood that they could exercise no control over options they had ordered except through appellant. Investors gave their money to appellant's salesman and ". . . let him more or less call the shots." One customer believed he had purchased an option from appellant. Appellant "calls the shots," and in so doing offers to handle all details of trading in commodities whether for its own account or for its customers. Once a customer has parted with his money, he is dependent upon the financial responsibility, business ability, integrity, expertise and market advice of appellant and, unknown to him, third parties who participate in appellant's commodity trading. It is the essential managerial efforts of those other than the investor which affect the failure or success of the enterprise. Investors are not required to, and they do not, exert any significant efforts in order to make a profit on their investment. For all practical purposes the critical managerial decisions affecting the investor's funds are solely within the control of appellant. And finally, an investor cannot, without the actual assistance of appellant, exercise his option and receive his profit.

Appellant states in its brief that it has found no case in the United States where a London option has been held to be a security. We do not so hold. We hold that under the facts of this case London options may be dealt with in such a manner that they become securities. To hold otherwise would allow the possibility of picking an orange in the investor's grove to thwart the State's broad regulatory powers over securities in the public interest. This regulation should be given the widest possible scope. Flowers v. Dempsey-Tegeler & Company, 472 S.W.2d 112 (Tex.1971).

Appellant has strongly urged that should we affirm the trial court's judgment, we will be overruling our decision in Koscot Interplanetary, Inc. v. King, 452 S.W.2d 531 (Tex.Civ.App.1970, writ ref. n. r. e.). We think not. We stated in *Koscot* that under its facts it was a hybrid case. There, under a multi-level marketing scheme, the efforts of the investor were a significantly integral part of the whole plan so that, even given the broadest possible application under the *Howey* test, the word "solely" could not be disregarded.

In view of our decision, we do not reach appellant's remaining points.

We affirm the judgment of the trial court enjoining appellant from selling securities involving London options, because the offer and sale of such securities without registration is prohibited by the Texas Securities Act.[5]

5. See Sec. 7 and Sec. 12, Art. 561, V.A.C.S.