INTERNATIONAL TRADING LTD.,
A Division of GNB, Inc.:
GNB, Inc., J. R. ROSE and Arthur PALMER
*v.* Harvey L. BELL, Securities
Commissioner for the State of
Arkansas

77-96                                    556 S.W. 2d 420

Opinion delivered October 3, 1977
(In Banc)
[Rehearing denied November 7, 1977.]

*Bellows & Associates*, by: *Joel J. Bellows* and *Charles B. Bernstein;* and *Davidson, Plastiras & Horne, Ltd.*, by: *Walter W. Davidson* and *Cyril Hollingsworth,* for appellants.

*Harvey L. Bell,* Securities Commissioner, by: *James T. Pitts,* Chief Counsel, Arkansas Securities Department, for appellee.

*Richard E. Nathan, Frederick T. Spindel* and *William E. Gressman,* Washington, D.C., for amcius curiae, The Commodity Futures Trading Commission.

JOHN A. FOGLEMAN, Justice. The chancery court enjoined appellants from directly or indirectly employing any device, scheme or artifice to defraud; making any untrue statement of a material fact or omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, or, engaging in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person. In doing so, the court overruled appellants' demurrer. Appellants elected to stand on that demurrer, which alleged that it appeared on the face of the complaint that the court had no jurisdiction of the subject matter and that appellee did not have the legal capacity to sue in this action. Since we find that the chancery court erred in overruling this demurrer, we must reverse the decree.

The complaint was filed by the Securities Commissioner for the State of Arkansas under the Arkansas Securities Act, as amended [Ark. Stat. Ann. § 67-1235 et seq]. In it, he alleg-

ed that International Trading, Ltd., a division of GNB, Inc., GNB, Inc., J. R. Rose and Arthur Palmer were engaging in acts and practices and a course of conduct which constitute violations of various sections of the act in offering and selling a type of commodity option contracts known as "London commodity options." He alleged that these acts and practices constituted a device, scheme or artifice to defraud and would operate as a fraud or deceit upon the purchasers of options and that appellants made misrepresentations of material facts or omitted to state material facts necessary to make the statements made not misleading in the light of the circumstances under which they were made. The acts and conduct specified were:

(a) engaging in an organized statewide, high-pressure, "boiler room" like sales campaign, conducted primarily by repeated, unsolicited, "cold-canvass" long distance telephone calls to persons who were inexperienced and unsophisticated as to London commodity options transactions, in which calls false and deceptive statements were made about profit expectations and the advisability of immediate purchase of such options to take advantage of purported favorable market prices for the options;

(b) hiring and directing sales persons without experience or knowledge of the risks and trading mechanics involved in such options and providing these salesmen with glowing, but deceptive and misleading "canned" sales speeches to be read to potential customers over the telephone, instructing these salespersons to conceal material facts, avoid unfavorable explanations, provide only minimal information, and tell these prospects anything to make a sale;

(c) representing and making it appear that the options being offered and sold would be purchased in the London market in the names of such customers, with the company acting as the purchaser's agent, when in fact the options were purchased in the name of the company for its own account at prices substantially less than the customers paid the company;

(d)   representing, without any reasonable basis, profits or returns which would double or triple the purchase price in a short period of time, but failing to disclose that many customers had actually lost their investments;

(e)   concealing and misrepresenting the true nature of the purchase price, including all fees and markups, which customers pay to the company for the purchase of London commodity options; concealing the fact that the company marks up the price of each option purchased in the London markets between 40 and 150 percent;

(f)   representing to purchasers and prospective purchasers that the company's salespersons are well trained and have several years' experience in the commodity option field, when, in fact, most of them have had substantially less than one year's experience and the company provides no meaningful training to such salespersons, who are not specialists in the field of commodity options;

(g)   failing to state that International Trading, Ltd., a division of GNB, Inc., and GNB, Inc. are foreign corporations not authorized to do business in Arkansas;

(h)   failing to disclose the risk of loss to potential investors;

(i)   failing to disclose that the investors were purchasing a commodity option rather than a true contract for future delivery of commodities;

(j) failing to disclose the actual closing date for transactions traded on the London Board of Options Exchange;

(k)   using high pressure telephonic sales techniques emphasizing the likelihood of profits and not considering the investment needs of the customer;

(l)   excessively marking up the price of the London commodity options sold to Arkansas investors;

(ll)   receiving compensation directly and indirectly for advising potential investors as to the value of these securities and employing a device, scheme or artifice to defraud and engaging in acts, practices or course of business which operated or would operate as a fraud or deceit upon purchasers in violation of Ark. Stat. Ann. § 67-1236 (a) (Repl. 1966) by omitting to state the material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

The court heard appellee's evidence on the allegations of fraud, but appellants, having elected to stand upon their demurrer, offered no evidence. Even so, the chancellor declined to make a finding that appellants had been guilty of fraud. The language of the decree stating the acts enjoined is couched entirely in words of § 1 of the Arkansas Securities Act [Ark. Stat. Ann. § 67-1235 (Repl. 1966)] declaring those acts, in connection with the offer, sale or purchase of securities to be unlawful.

For the purposes of this opinion we assume, but do not decide, that a London commodity option is a security, as alleged in appellee's complaint and defined by Ark. Stat. Ann. § 67-1247 (1). If it is, it would be subject to regulation under the Arkansas Securities Act, except for the preemption of the field by the United States Congress through the Commodity Futures Trading Commission Act, an amendment to the Commodity Exchange Act. 7 USCA § 1 et seq.

In order to understand the question presented, it is necessary that certain terms, not generally familiar, be defined, as we understand them.

A commodity futures contract is a contract by which a seller agrees to deliver a definite quantity of a commodity in a specified future month, and the purchaser agrees to accept and pay for the commodity when it is delivered. The terms of the contract, except for the price, are fixed by the organized exchange through which the trading is done. Campbell, Trading in Futures Under the Commodity Exchange Act, 26 George Washington Law Review 215, 216-218. The price is

determined by open bidding by traders on the floor of the commodity exchange. See *Clayton Brokerage Co. of St. Louis* v. *Mouer*, 520 S.W. 2d 802 (Tex. Civ. App., 1975); § 7 USCA §§ 6, 6b, 6c, Supp. 1977.

A commodity option is a contract right, purchased from the option seller for a fee called the "premium," to buy from, or sell to, the option seller, the underlying commodity futures contract at a fixed price called the "striking price," at any time during the life of the option. The striking price is usually the market price of the underlying commodity futures contract on the day that the option contract is sold. The option period is usually fixed, ranging from one month to a year or 18 months. An option to sell the underlying commodity futures contract is known as a "put." An option to buy the underlying commodity futures contract is known as a "call." It is also possible for the option purchaser to buy both a put and a call on the same commodity at the same time. Such a purchase is known as a "straddle," or, more commonly, as a "double option." Long, The Naked Commodity Option Contract as a Security, 15 Wm. & Mary L. Rev. 211, 212-14 (1974).

The purchaser of a call theoretically makes his profit when the market for the underlying commodity futures rises. If this occurs, he exercises his option, purchasing the underlying commodity futures contract from the option seller at the striking price and reselling it in the open market. His profit is the difference between the striking price and his selling price, less the premium he paid for the option. The purchaser of a put will profit similarly if the market falls sufficiently from the striking price for his profit on the futures contract to exceed the premium. Id. at 213. The purchaser of a double option will profit whether the market rises or falls, provided that the difference between the rise or fall and the striking price exceeds the premium he paid to the option seller. A commodity option is considered a more conservative investment than a commodity futures contract because the risk of loss is limited to the premium paid and is not a concomitant of price fluctuations in the commodity which may lead to additional margin calls. Note, Federal Legislation for Commodity Option Trading: A Proposal, 47 So. Cal. L. Rev. 1418, 1424-25 (1974).

Commodity option contracts in various forms have been present in the financial market place for a number of years. Before 1934, contracts on domestic commodities, such as wheat and cotton, were traded extensively on the major American exchanges. In that year, however, the Commodity Exchange Authority (CEA) banned trading in options on domestic commodities because of the abuses which had developed in the commodity option market. Trading in international, or "world" commodities, including silver, silver coins, platinum, cocoa, plywood, copper, coffee, and world sugar, was not affected, since such items were not subject to CEA jurisdiction. Long, cit. supra, pp. 213-14.

A London option is a right, for a price, to purchase or sell a commodity futures contract for a specified term at a specified price. Thus it is simply an extention of a commodity futures contract and is traded on the same London commodity exchanges as the underlying futures contract. World commodities traded on the London exchange include sugar, cocoa, coffee, rubber, silver and copper. See *Clayton Brokerage Co. of St. Louis, Inc.* v. *Mouer,* supra, appeal dismissed as mooted by reason of preemption by Commodity Futures Trading Commission Act of 1974, 531 S.W. 2d 805. For other discussions defining these terms and the commodity trading business, see *British American Commodity Operations Corp.* v. *Bagley,* 552 F. 2d 482 (2 Cir., 1977). For a discussion of the London option market and the sale of London options in the United States, see Long, Commodity Options — Revisited, 25 Drake L. Rev. 75, 111-128 (1975).

The language which we find to be a clear manifestation of the intention of Congress to exclude states from this field is found in provisos added to the Commodity Exchange Act by the Commodity Future Trading Act as set out in 7 USCA § 2 (Supp. 1977). They are:

> *** *Provided,* That the Commission shall have exclusive jurisdiction with respect to accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an "option", "privilege", "indemnity", "bid", "offer", "put", "call" "advance guaranty", or "decline guaranty"), and tran-

sactions involving contracts of sale of a commodity for future delivery, traded or executed on a contract market designated pursuant to section 7 of this title or any other board of trade, exchange, or market, and transactions subject to regulation by the Commission pursuant to section 15a of this title: *And provided further,* That, except as hereinabove provided, nothing contained in this section shall (i) supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission or other regulatory authorities under the laws of the United States or of any State, or (ii) restrict the Securities and Exchange Commission and such other authorities from carrying out their duties and responsibilities in accordance with such laws. Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State. ***

The language seems to us to express a clear intention to vest exclusive jurisdiction of the regulation of commodity options in the Commodity Futures Trading Commission and to supersede the jurisdiction of all state and federal agencies. Our conclusion is fortified by another section of the act, now appearing as 7 USCA 6c (b) (Supp. 1977), where Congress said:

No person shall offer to enter into, enter into, or confirm the execution of, any transaction subject to the provisions of subsection (a) of this section involving any commodity regulated under this chapter, but not specifically set forth in section 2 of this title, prior to the enactment of the Commodity Futures Trading Commission Act of 1974, which is of the character of, or is commonly known to the trade as, an "option", "privilege", "indemnity", "bid", "offer", "put", "call", "advance guaranty", or "decline guaranty", contrary to any rule, regulation, or order of the Commission prohibiting any such transaction or allowing any such transaction under such terms and conditions as the Commission shall prescribe within one year after the effective date of the Commodity Futures Trading Commission Act of 1974 unless the Commission determines and notifies the Senate Committee on Agriculture and Forestry and the

House Committee on Agriculture that it is unable to prescribe such terms and conditions within such period of time: *Provided,* That any such order, rule, or regulation may be made only after notice and opportunity for hearing: *And provided further,* That the Commission may set different terms and conditions for different markets.

This view is further strengthened by the report of the Congressional Conference Committee on the House and Senate versions of the bill for the act in question. That committee said:

The clarifying amendments make clear that (a) the Commission's jurisdiction over futures contract markets or other exchanges *is exclusive and includes the regulation of . . . commodity options;* [and] (b) *the Commission's jurisdiction, where applicable, supersedes State as well as Federal agencies . .*

Under the exclusive grant of jurisdiction to the Commission, the authority in the Commodity Exchange Act (and the regulations issued by the Commission) would preempt the field insofar as futures regulation is concerned . . . . *In view of the broad grant of authority to the Commission to regulate the futures trading industry, the Conferees do not contemplate that there will be a need for any supplementary regulation by the States.* [Emphasis ours.]

See Senate Miscellaneous Reports on Public Bills, IX, Sen. Rep. 1178-1239, 93d Congress, 2d Session, pp. 35-36; see also, *Securities and Exchange Commission* v. *American Commodity Exchange, Inc.,* 546 F. 2d 1361 (10 Cir., 1976) for other legislative history.

The vesting of exclusive jurisdiction is a clear indication that Congress intended no regulation in this field except under the authority of the act. See *Rice* v. *Santa Fe Elevator Co.,* 331 U.S. 218, 67 S. Ct. 1146, 91 L. Ed. 1447 (1947); Johnson, Commodity Futures Trading Act: Preemption as Public Policy, 29 Vanderbilt L. Rev. 1, 2, 20.

Where the act conferred jurisdiction on the commission,

at least one other court has held that it preempted the field of regulation insofar as the states are concerned. *State* v. *Monex International, Limited,* 527 S.W. 2d 804 (Tex. Civ. App., 1975), applied to London commodity options in *Clayton Brokerage Co. of St. Louis* v. *Moeur,* 531 S.W. 2d 805 (Tex. Sup. Ct., 1975). It has also been held that the act stripped the Securities Exchange Commission of authority previously vested in it. *Securities Exchange Commission* v. *Univest, Inc.,* 405 FS 1057 (DC, Ill., 1975), 410 FS 1029, remanded 556 F. 2d 584 (7 Cir., 1977). There is at least tacit recognition of the preemption in some cases in which it has been held that pending actions or actions taken before the newly created commission could act were not affected. See, e.g., *State* v. *Coin Wholesalers, Inc.,* 250 N.W. 2d 583 (Minn. 1976).

Appellee makes some very appealing arguments in seeking to sustain his position that there is no preemption. First, he seizes upon the clause stating that "except as hereinabove provided, nothing contained in this section shall (i) supersede or limit the jurisdiction at any time conferred on . . . other regulatory authorities under the laws . . . of any State or (ii) restrict . . . such other authorities from carrying out their duties and responsibilities in accordance with such laws," and the statement that "[n]othing in this act shall be deemed to supersede or limit the jurisdiction conferred on courts of . . . any state." The argument that the exception relates only to regulation of commodities, not securities, is unavailing here because of the clear language of the act bringing commodity options within the purview of the act. The exception, then, eliminates the subject matter of this action from the jurisdiction of the regulatory laws of a state. Perhaps the Commodity Futures Trading Commission cannot regulate London exchanges, but it does have jurisdiction over accounts, agreements (including options) and transactions on contract markets or any other board of trade, exchange or market.

Appellee also argues that because the Arkansas Securities Act is not in conflict with the federal act, he should not be prevented from enforcing the state regulatory scheme. Where, however, as here, Congress has made it clear that authority conferred by it is exclusive in a given area the states cannot exercise concomitant or supplementary regulatory authority over the identical activity. *Northern States Power Co.* v.

*State,* 447 F. 2d 1143 (8 Cir., 1971); *Rice* v. *Santa Fe Elevator Corp.,* supra, 331 U.S. 218; *Campbell* v. *Hussey,* 368 U.S. 297, 82 S. Ct. 327, 7 L. Ed. 2d 299 (1961).

Appellee, consistent with his argument that Congressional intent to preempt is not manifest, invokes a test he finds in *Northern States Power Co.* v. *State,* supra, i.e.: (1) what is the intent of Congress as expressed in the legislative history of the act, (2) how pervasive is the federal regulatory scheme, (3) does the nature of the subject require exclusive regulation, and (4) is state law an obstacle to federal enforcement? An affirmative answer to all these questions is not required as a basis for finding an implied federal preemption. The court in that case stated these tests only as factors to be considered. Although we would be compelled to answer the fourth question in the negative, if we consider only the terms of the Arkansas Securities Act as presently written, the potential for obstacles is just as important as their existence. See *Rice* v. *Santa Fe Elevator Corp.,* supra. Commodity Futures Trading Commission regulations could change this answer. As to the other questions, our answers are in the affirmative. We have already mentioned the legislative history and the broad scope of the Commodity Futures Trading Commission Act. There was at least a Congressional finding that the nature of the subject matter demanded exclusive federal regulations and we cannot say that this finding was unfounded. See Johnson, The Commodity Futures Trading Commission Act: Preemption as a Public Policy, 29 Vanderbilt Law Review 1. Even if we apply appellee's tests, we find a strong implication that federal preemption was intended.

We do not agree with appellee that preemption will prevent the state from protecting its citizens from fraud. There is no reason why the state cannot prosecute an offender under such provisions as § 41-2203 (Crim. Code, 1976). There is no bar of actions by persons defrauded to recover money obtained from them by fraud. Such actions could not constitute any realistic threat of interference with the federal regulatory scheme and the act certainly does not afford protection of fraudulent conduct. See *Farmer* v. *United Brotherhood of Carpenters of America,* 430 U.S. 290, 97 S. Ct. 1056, 51 L. Ed. 2d 338 (1977).

Finally, appellee's invocation of the Tenth Amendment is unavailing where the Congress had the power to act and, in acting, manifestly intended to preempt the field. In such a case, the supremacy clause (Art. VI, § 2) clearly has a bearing. See *Rice v. Santa Fe Elevator Corp.*, supra, 331 U.S. 218; *Northern States Power Co. v. State*, supra, 447 F. 2d 1143. We do not understand appellee to argue that Congress has no power to regulate trading in London commodity options in the United States. It seems rather obvious to us that Congress does have the power under the commerce clause of the United States Constitution. This case does not involve the exercise of power which impairs the integrity of the states or their ability to function effectively, as was the case in *National League of Cities v. Usery*, 426 U.S. 833, 96 S. Ct. 2465, 49 L. Ed. 2d 245 (1976) upon which appellant relies. The case involved an attempt by Congress to prescribe minimum wages to be paid to state employees by the states, acting in their sovereign capacity. Clearly, there is no such invasion of the sovereignty of the states involved here. Here the exercise of congressional authority was directed to private citizens, not to the states as states, or to functions essential to their separate and independent existence.

We find that the chancery court had no jurisdiction to act in this proceeding under the provisions of the Arkansas Securities Act, and that the appellee had no standing to bring this action so the decree of the chancery court is reversed and the cause is dismissed.

HICKMAN, J., dissents.