PAINE, WEBBER, JACKSON & CURTIS, INCORPORATED, Plaintiff,

v.

James T. CONAWAY, Defendant.

PAINE, WEBBER, JACKSON & CURTIS, INCORPORATED, Plaintiff,

v.

Charlie M. CONAWAY, Defendant.

Civ. A. Nos. CV 80–G–0117–S and CV 80–G–0118–S.

United States District Court,
N. D. Alabama, S. D.

Feb. 3, 1981.

On Motion For Additional, Partial Summary Judgment April 15, 1981.

Thomas S. Lawson, Jr., Capell, Howard, Knabe & Cobbs, Montgomery, Ala., for plaintiff.

Michael L. Edwards, Berkowitz, Lefkovits & Patrick, Birmingham, Ala., for defendants.

## MEMORANDUM OPINION

J. FOY GUIN, Jr., District Judge.

This cause came to be heard on defendants' motions for summary judgment and plaintiff's cross-motion for partial summary judgment. The actions brought by Paine, Webber, Jackson & Curtis, Incorporated (hereinafter referred to as "Paine, Webber") against the defendants, James T. Conaway and Charlie M. Conaway, are consolidated for all proceedings related to the motions for summary judgment.

The court has read the excellent briefs submitted by the attorneys for both sides and found them both to be remarkably persuasive. The court finds, however, that plaintiff's motion for partial summary judgment should be granted for alternative reasons. Obviously, this decision requires denial of defendants' motions for summary judgment.

On September 20, 1979, Paine, Webber entered into a client commodity agreement with the Conaways, under which trading accounts were opened in their names. During the next three months, Paine, Webber entered into a series of contracts with the Conaways for the purchase of a total of $80,000,000 in treasury bill futures contracts. In each case, Paine, Webber in turn executed contracts on the Chicago Merchantile Exchange for the purchase or sale of treasury bills for future delivery. Neither of the Conaways made or took delivery of any treasury bills; rather, each contract for future delivery was settled by an offsetting transaction on the Exchange.

The main question for the court is whether the Commodity Exchange Act, 49 Stat. 1491 (1936), 7 U.S.C. §§ 1–22, as amended by the Commodity Futures Trading Commission Act of 1974, Pub.L.No.93–463, 88 Stat. 1389 (1974), preempts a state gambling statute which purports to void all futures transactions in which delivery of the commodity is not intended. However, before addressing this issue, the court will analyze the meaning of "delivery" as used in the Alabama gambling statute in question, Code of Alabama 1975, Sections 8–1–120, et seq., to determine whether it encompasses constructive delivery—i. e., offsetting transactions—or means only actual delivery.

The primary Alabama statute in question provides in part:

(a) All contracts of sale for the future delivery of any commodity, article, personal property, stock or bond, wherein the parties thereto *do not intend a delivery* of the article contracted for, but do intend to gamble on the difference between the contract price and some subsequent market price, shall be illegal and void, and no action shall be maintained in any court to enforce such contract or to compel payment of any note or security given in payment or settlement of the same.

Code of Alabama 1975, Section 8–1–121 (emphasis added).

The language in this statute is ambiguous in that it does not define "delivery." The Conaways argue it means "actual" delivery, and their depositions reflect that they never

intended to take actual delivery of a treasury bill but intended only to speculate in the market. Paine, Webber argues that the language of the statute must be read to permit delivery by offset, and that the Conaways were told that physical delivery was required unless offsetting transactions were made.

Plaintiff cites in support of its contention *Board of Trade v. Christie Grain and Stock Company*, 198 U.S. 236, 25 S.Ct. 637, 49 L.Ed. 1031 (1905), a United States Supreme Court case which involved a state antigambling statute predicated on intention not to receive delivery. The Court found the statute inapplicable because there was an offset-type delivery. The Court held that such an offsetting contract between brokers on the exchange had the legal effect of a delivery, and that transactions which are concluded by offsetting transactions on the exchange are not invalidated by state wagering statutes which require intention to take delivery. The Court said:

> The fact that contracts are satisfied in this way by setoff and the payment of differences detracts in no degree from the good faith of the parties, and if the parties know when they make such contracts that they are very likely to have a chance to satisfy them in this way and intend to make use of it, that fact is perfectly consistent with a serious business purpose and an intent that the contract shall mean what it says . . . .

*Id.* at 248, 25 S.Ct. at 639 (1905).

Paine, Webber also cites the case of *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Schriver*, 541 S.W.2d 799 (Tenn.Ct.App. 1976), *cert. denied*, 541 S.W.2d 799, which held that the Tennessee antigambling statute did not apply where delivery was made by offset. The court said:

> A "setoff" is a method by which a contract to purchase is set off against a contract to sell without an exchange of warehouse receipts or other actual delivery and, in legal effect, is a delivery.

*Supra* at 803, quoting *Palmer v. Love*, 18 Tenn.App. 579, 80 S.W.2d 100 (1934).

It is a basic tenet of contract law that parties to a contract are presumed to intend a valid contract, and that a contract will be construed to support its validity if reasonably subject to such construction. *See Bullock County v. Sherlock*, 242 Ala. 262, 5 So.2d 800 (1942). The contractual stipulation that a type of delivery was intended and the general rule that contracts should be construed to support their legality require that delivery by offsetting transactions be recognized as fulfilling the requirements of the Alabama gambling statutes. If the intent of the Alabama Legislature in passing the aforementioned statute was to require actual delivery of the commodity as opposed to constructive delivery as recognized in the trade, it should have made it clear. This court holds that offsetting transactions were a type of delivery contemplated by the parties to this action and such constructive delivery does not offend Code of Alabama 1975, Section 8–1–121, and it is therefore not applicable to this case.

In the alternative, however, if the Alabama statute were construed to require the intention of actual physical delivery and therefore appear to void the Conaways' transactions on the Chicago Merchantile Exchange, federal preemption would prevent this result. Preemption of state statutes can arise from a number of factors.

> Deciding whether a state statute is in conflict with a federal statute and hence invalid under the Supremacy Clause is essentially a two-step process of first ascertaining the construction of the two statutes and then determining the constitutional question whether they are in conflict.

*Perez v. Campbell*, 402 U.S. 637, 644, 91 S.Ct. 1704, 1708, 29 L.Ed.2d 233, 239 (1971). As Justice Black said in *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581, 587 (1941), "[o]ur primary function is to determine whether [a challenged state statute] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Preemption arises in this case because with the

passage of the Commodity Futures Trading Commission Act of 1974 the federal government has moved to occupy the entire field of commodities futures traded on federally regulated exchanges and because the state statute, so construed, would conflict with the objectives of the federal statutes and interfere with the stated federal purpose of fostering the commodity markets.

In response to increased participation in commodity markets, Congress enacted the Commodity Futures Trading Commission Act of 1974, the primary purpose of which is to ensure fair practice and honest dealing and to provide some control over excessive speculative activity which causes injury to producers, consumers and the exchanges. To enforce the Act's provisions, Congress created a new independent regulatory agency, the Commodity Futures Trading Commission (CFTC).

The former deputy general counsel of the CFTC and the former chief counsel of the Division of Trading and Markets have jointly said, "where the CFTC determines implementation of a regulation would place an undue burden on the registrant and the industry, state regulation which contradicts the CFTC decision not to regulate would be invalid."[1] The Alabama statute construed as aforementioned would not merely place an undue burden, it would destroy the commodities industry in Alabama and, if applied in other states, nationwide.

' The legislative history clearly indicates that Congress intended to preempt state jurisdiction over transactions that the Act covers.[2] A sentence in the Commodity Exchange Act which could have been construed as continuing state law in the field was purposefully deleted from the Act to assure preemption of state regulatory authority.[3]

The conference report on the final bill stated that the Commission "would preempt the field insofar as futures regulation is concerned." *Id.* As Purcell and Valdez have noted, if any substantive state law regulating futures trading is contrary to or inconsistent with the Act, the Act will govern."[4] Although there is no federal interest in whether a state prevents fraudulent commodity transactions, there unquestionably is a federal interest in whether a state brands commodity transactions as "gambling" and effectively bars those transactions on federally regulated exchanges.

Examples of cases preempting state action are relevant. In *International Trading Limited v. Bell*, 262 Ark. 244, 556 S.W.2d 420 (1977), *cert. denied*, 436 U.S. 956, 98 S.Ct. 3068, 57 L.Ed.2d 1120, the Arkansas Supreme Court reversed a decision wherein a lower court had enjoined the defendant from committing fraud in connection with London commodity options. The court stated:

> Where ... Congress has made it clear that authority conferred by it is exclusive in a given area the states cannot exercise concomitant or supplementary regulatory authority over the identical activity.

*Id.* 556 S.W.2d at 425. The court held that by the provisions added to the Commodity Exchange Act by the Commodity Futures Trading Commission Act of 1974, Congress intended to vest exclusive jurisdiction of the regulation of commodity options in the Commodity Futures Trading Commission and to supersede the jurisdiction of all state and federal agencies. The enforcement of Arkansas's fraud provisions would merely hamper commodity sales, while Alabama's gambling provisions would destroy them. In *Hofmayer v. Dean Witter*, 459 F.Supp. 733 (N.D.Calif.1978), the district court for

1. Russo and Lyon, *The Exclusive Jurisdiction of the Commodity Futures Trading Commission*, 6 Hofstra L.Rev. 57, 70 (1977).

2. Purcell and Valdez, *The Commodity Futures Trading Commission Act of 1974: Regulatory Legislation for Commodity Futures Trading in a Market-Oriented Economy*, 21 S. Dakota L.Rev. 555, 573 (1976).

3. S.Conf.Rep.No.93–1383, 93rd Cong., 2nd Sess., reprinted in [1974] U.S.Code Cong. & Ad.News 5843, 5894 at 5897.

4. 21 S. Dakota L.Rev. at 573.

the Northern District of California found that Congress had plainly stated an intent to preempt in the Commodity Futures Trading Commission Act of 1974.

The defendants cite the case of *Paine, Webber, Jackson and Curtis, Inc. v. Lambert,* 389 F.Supp. 417 (E.D.Tenn.1975), a case in which the district court for the Eastern District of Tennessee found the Tennessee antigambling statute did not invalidate futures contracts in which delivery is not intended. Although dictum in this decision is to the effect that there was no preemption, the court found that Tennessee's laws did not affect at all the contracts sued on. Therefore, there was no real issue of preemption. Since this case was decided on facts occurring before passage of the present Commodity Futures Trading Commission Act, the court's discussion on preemption is based on the Commodity Exchange Act as it existed in 1964, and not the Commodity Futures Trading Commission Act of 1974. *Id.* at 420, fn. 4.

The Futures Trading Act of 1978, Pub.L. No.95–405, 92 Stat. 865 (1978) (amending 7 U.S.C. §§ 1–22), continued the preemption of state gambling laws. Under that Act, states are only given authority to proceed "in state court on the basis of an alleged violation of any general civil or criminal antifraud statute." H.R.Rep.No.95–1239, 95th Cong. 2d Sess., page 10. Given the general preemptive approach to the federal legislation, this specific allowance of antifraud proceedings must be deemed to preclude antigambling proceedings. *Inclusio unius est exclusio alterius.*

The commodity exchanges are national markets wherein dealers, customers and brokers deal across state lines to provide an extremely vital component in our economic system. As one commentator noted:

> The Congress accepted the view that the commodity exchanges are "necessary and of definite value to our commercial and agricultural life." It would seem that state wagering statutes which would vitiate or terminate all futures trading on all exchanges in the United States cannot be reconciled with the congressional purpose

to foster the exchanges as an important part of our agricultural marketing system.

> The fact that the volume of deliveries on the exchanges is relatively small does not detract from the importance of the exchanges as a part of our agricultural marketing system. The exchanges permit hedging by buyers and sellers, handlers and processors of agricultural commodities all of whom generally offset their contracts on the exchanges instead of making or taking delivery. Without the possibility of shifting the risk of price changes to the speculators, the hedgers would have to increase their margins of profit thereby widening the spread between the price received by the farmers for their products and the price paid by the ultimate consumers. In any event, however, *the congressional purpose that the exchanges continue to function is clearly revealed, and any conflictive state statute is, therefore, superseded.*

Campbell, *Trading in Futures Under the Commodity Exchange Act,* 36 George Wash. L.Rev. 215, 252–53 (1957) (emphasis added) (footnotes omitted).

This court distinguishes the case at bar from the case of *Dickson v. Uhlmann Grain Co.,* 288 U.S. 188, 53 S.Ct. 362, 77 L.Ed. 691 (1933), in that it is a fifty-year-old case decided under a radically different statute, the Grain Futures Act, 42 Stat. 998 (1922), and involved bucket shops wherein customers' orders were not legitimately placed.

Thus this court finds that the Alabama gambling statutes, if construed to require actual delivery, would directly conflict with the federal purpose of fostering the markets in that they would destroy the markets in this state, and that Congress has preempted the field. There is no doubt that such statutes would certainly hinder the federally controlled exchanges, as pointed out in the *Hofmayer* and *International Trading Limited* cases.

For the foregoing reasons the defendants' motions for summary judgment are due to be denied and plaintiff's motion for partial summary judgment is due to be granted.

An order to this effect will be entered contemporaneously with the filing of this opinion.

## ON MOTION FOR ADDITIONAL, PARTIAL SUMMARY JUDGMENT

This cause came before the court on plaintiff's motion for additional, partial summary judgment as to Counts II, III and IV of each of the defendants' separate counterclaims. Having considered the pleadings, submissions of counsel, oral argument and applicable law, the court is of the opinion that, as to Counts II and IV, there is no genuine issue of material fact, and that plaintiff is entitled to judgment as a matter of law; as to Count III, the court is of the opinion that plaintiff is not entitled to judgment as a matter of law.

Accordingly, it is ORDERED, ADJUDGED and DECREED that plaintiff's motion for summary judgment be and the same hereby is GRANTED as to Counts II and IV of each of the defendants' counterclaims and DENIED as to Count III of the counterclaims; and it is

FURTHER ORDERED that this case proceed to trial on the remaining claims (said claims being those stated in the plaintiff's complaints and Counts III and V of the defendants' counterclaims).

## SUPPLEMENTAL OPINION

This case as originally filed was for money owed on account by both defendants to Paine, Webber, Jackson & Curtis, Inc. (Paine, Webber), for treasury bill futures contracts. Each of the defendants answered and filed separate counterclaims, asserting inter alia that the accounts upon which Paine, Webber sues are void under Alabama law which prohibits speculation contracts. The parties filed cross-motions for summary

judgment and the court consolidated the cases for consideration of those motions. On February 3, 1981, the court entered its order denying the defendants' motions for summary judgment, and granting the plaintiff's motion for summary judgment as to Count I of the counterclaim, to the effect that the treasury bill futures contracts are not void under Code of Alabama, § 8–1–121.

Pursuant to the pretrial order entered March 12, 1981, the cases were consolidated for further proceedings and trial.

This case is presently before the court on plaintiff's motion for additional, partial summary judgment as to Counts II, III and IV of the defendants' counterclaims. Count II asserts unspecified violations of the Commodity Futures Trading Commission Act,[1] 7 U.S.C. § 4a et seq. Count III alleges that a treasury bill is a "security" and that Paine, Webber made misrepresentations and omissions in connection with the sale of treasury bill futures contracts in violation of Rule 10b–5 of the Securities and Exchange Commission, 17 C.F.R. § 240.10b–5 (1979). In Count IV, the defendants contend that the treasury bill futures contracts were investment contracts and therefore were securities which should have been registered but were not, in violation of the Securities Exchange Act of 1933.

The plaintiff, in its motion for summary judgment, contends that no private cause of action exists under the Commodity Exchange Act, as amended by the Commodity Futures Trading Commission Act of 1974, and that the transactions between the plaintiff and defendants are not securities and therefore not governed by the securities laws.

For the reasons stated herein, the court is of the opinion that summary judgment is due to be granted the plaintiff as to Counts

---

1. In their counterclaims, the defendants refer to the act as the "Commodity Futures Trading Act." Actually, the short title of the complete chapter is the Commodity Exchange Act. See 7 U.S.C. § 1. The CEA has been amended numerous times since first enacted in 1921. In 1974, it was extensively revised by the Commodity Futures Trading Commission Act of 1974, which added § 4a et seq. and created the Commodity Futures Trading Commission. Pub.L.No.93–463, 88 Stat. 1389. The act was further amended in 1978 by the Futures Trading Act, Pub.L.No.95–405, 92 Stat. 865. Throughout this opinion, the general act will be referred to as the Commodity Exchange Act (CEA) and the specific amendments will be mentioned where applicable.

II and IV, and is due to be denied as to Count III.

*Count II of the Counterclaims*

■ In Count II of their counterclaims, the defendants contend that the plaintiff committed unspecified violations of the Commodity Futures Trading Commission Act. Since no specific violations of any particular provisions are asserted, it is difficult to comprehend the basis for this count of the counterclaims. Assuming that this contention is sufficient, the issue at hand is whether a private right of action exists under the Commodity Exchange Act (CEA) as amended by the Commodity Futures Trading Commission Act (CFTCA) of 1974.

There exists a split among the courts as to whether a private judicial right of action survived the 1974 amendments to the CEA.[2] In a recent decision, the Fifth Circuit resolved that problem for this court when it held that no such private right of action exists. *Rivers v. Rosenthal & Company*, 634 F.2d 774 (1980).

The Fifth Circuit examined the judicial history of the Commodity Exchange Act under which the courts unanimously held that a private cause of action existed *prior* to the 1974 amendments. 634 F.2d at 779. The court then thoroughly discussed the legislative history of the 1974 amendments. The 1974 amendments, contained in the Commodity Futures Trading Commission Act, differed in character from the earlier amendments to the CEA and signaled a dramatic shift to a comprehensive regulatory scheme. 634 F.2d at 779. The 1974 Act created the Commodity Futures Trading Commission (CFTC) and vested it with exclusive jurisdiction over futures trading. 7 U.S.C. § 4a. Further, the elaborate overhaul of the enforcement mechanism resulted in the provision, for the first time, of an express means for persons injured by violations of the regulations to seek redress in two ways. First, the 1974 Act requires each designated contract market to provide for arbitration or other informal procedure whereby customers' claims and grievances can be settled. 7 U.S.C. § 7a(11). Second, the act established an administrative procedure through which complaints could be filed with the CFTC. 7 U.S.C. § 18. For a more complete discussion of the 1974 amendments see *Rivers v. Rosenthal & Co.*, 634 F.2d at 779–781; *Mullis v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 492 F.Supp. 1345, 1349–51 (D.Nev.1980).

After its thorough examination of the legislative history, the court in *Rivers* concluded that the 1974 Act was not merely a reenactment of the prior law, but a complete overhaul. Further, the court noted that where a statute expressly provides a particular remedy, caution should be exercised before implying other remedies. "Thus Congress' express provision in 1974 of the numerous judicial and administrative means for enforcing compliance with the antifraud and other provisions of the CEA—and most particularly the remedial mechanisms of arbitration and reparations procedures—in effect creates a presumption against the implication of yet another unexpressed judicial means of enforcement and remedy." 634 F.2d at 784.

■ The dispositive inquiry in determining whether an implied right of action exists, according to recent Supreme Court decisions, is divining whether Congress intended such a cause of action to be created. 634 F.2d at 781, *citing Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 15, 23, 100 S.Ct. 242, 245, 249, 62 L.Ed.2d 146 (1979), and *Touche Ross & Co. v. Redington*, 442 U.S. 560, 568, 576, 99 S.Ct. 2479, 2485, 2489, 61 L.Ed.2d 82 (1979). The Fifth Circuit recognized that those asserting the existence of an implied private cause of

---

**2.** Since the 1974 amendments, the Second and Sixth Circuits have ruled, over strong dissents, that an implied private right of action still is alive under the CEA. *Leist v. Simplot*, 638 F.2d 283 (2d Cir. 1980), *petition for cert. filed sub nom. New York Mercantile Exchange v. Leist*, 49 U.S.L.W. 3388 (Nov. 12, 1980) (No.

80–757); *Curran v. Merrill Lynch, Pierce, Fenner & Smith*, 622 F.2d 216 (6th Cir. 1980); *petition for cert. filed,* —— U.S. ——, 101 S.Ct. 1971, 68 L.Ed.2d 293 (1981). For a partial list of district court decisions on this issue, see *Rivers v. Rosenthal & Co.*, 634 F.2d at 778 n.7.

action have the burden to establish that proposition. 634 F.2d at 783. The plaintiffs in the *Rivers* case, as have the defendants in this case, failed to demonstrate that Congress intended to provide a cause of action.

Other cases also support this conclusion. For example, in *Consolo v. Hornblower & Weeks-Hemphill, Noyes, Inc.*, 436 F.Supp. 447 (N.D.Ohio 1976), the court concluded that an aggrieved client must first exhaust the administrative remedies created by CFTCA before further pursuing an action in federal court. 436 F.Supp. at 454. To like effect is *Berman v. Bache, Halsey, Stuart, Shields*, 467 F.Supp. 311 (S.D.Ohio 1979). In that case, the court thoroughly examined the legislative history of the 1974 amendments and determined that the implication of a private cause of action would be inconsistent with the overall scheme adopted by Congress for regulating the commodity futures market. 467 F.Supp. at 322. The court further noted that "a plethora of private actions in the federal court would deprive the CFTC of the opportunity 'to build upon the foundation provided by the Commodity Exchange Act in erecting a sound and strong Federal regulatory policy governing futures trading.' S.Rep.No.95–850, *supra* at 13, U.S.Code & Admin.News 1978, p. 3831." 467 F.Supp. at 323.

Based on the well-reasoned *Rivers* opinion, other cases and legislative history, and the facts of this case, the court is of the opinion that no private cause of action exists for violations of the Commodity Exchange Act, outside the administrative reparation procedures provided therein. Therefore, the defendants' counterclaim alleging violations of the Commodity Exchange Act must be dismissed.

*Count III of Counterclaims*

█ The third count of the defendants' counterclaims asserts that Paine, Webber,

recklessly or with the intent to deceive, made misrepresentations and omissions in connection with the sale of treasury bill futures contracts, in violation of Rule 10b–5 of the Securities Exchange Commission, 17 C.F.R. § 240.10b–5. The plaintiff contends that commodity futures contracts are not securities and thus are not governed by the securities laws. The plaintiff further argues that, although a treasury bill is a security, no treasury bills were sold in the transactions between the plaintiff and defendants.

The court agrees with the plaintiff that a commodity futures contract is not a security. *See Moody v. Bache & Co.*, 570 F.2d 523, 525 (5th Cir. 1978); *SEC v. Continental Commodities Corp.*, 497 F.2d 516, 520 n.9 (5th Cir. 1974). Further, "[a] commodity future contract is no more or less than an option; the purchaser agrees to take delivery, or the seller agrees to make delivery, of a specified quantity of a specified commodity at a specified future time at a specified price." *Moody v. Bache & Co.*, 570 F.2d at 526, *quoting McCurnin v. Kohlmeyer & Co.*, 340 F.Supp. 1338, 1341 (E.D.La.1972), *aff'd per curiam*, 477 F.2d 113 (5th Cir. 1973).[3]

Although a commodity future contract itself is not a security, the fact that the underlying commodity in these cases was a treasury bill, itself a security,[4] makes a difference as to the alleged Rule 10b–5 violation. Since Rule 10b–5 prohibits fraud and misrepresentation ". . . in connection with the purchase or sale of any security," 17 C.F.R. § 240.10b–5 (1980), it is clear that a contract which provides for the delivery of a security at a future date falls within the ambit of Rule 10b–5.[5] "It is not essential . . . that full title pass to a transferee for the transaction to be an 'offer' or a 'sale.'" *Rubin v. United States*, —— U.S. ——, ——, 101 S.Ct. 698, 701, 66 L.Ed.2d 633 (1981).

---

**3.** Another court defined a commodity futures contract as "little more than a wager." *Berman v. Bache, Halsey, Stuart, Shields*, 467 F.Supp. 311, 316 (S.D.Ohio 1979).

**4.** *See* 31 C.F.R. § 306.2(r) (1980).

**5.** There is no indication of Congressional intent to narrow the broad scope of protection afforded the public by the antifraud provisions of Rule 10b–5 and the statute on which it is founded. 15 U.S.C. § 78j.

Since a contract for future purchase or sale of a treasury bill is covered by Rule 10b–5, summary judgment as to Count III is due to be denied.

*Count IV of the Counterclaims*

■ Count IV alleges that the treasury bill futures contracts qualify as investment contracts and thus constitute securities which should have been registered with the SEC. Again, the plaintiff contends that such a contract is not an investment contract and therefore not a security.

The term "security," by definitions of the securities acts, includes investment contracts. An investment contract was defined by the Supreme Court in the often-cited case of *SEC v. W. J. Howey Co.*, 328 U.S. 293, 298–99, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244, 1249 (1946), as " . . . a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party."

In applying the *Howey* test to nondiscretionary trading accounts, virtually all courts agree that the simple commodity futures contract is neither an investment contract nor a security. *E. g., SEC v. Continental Commodities Corp.*, 497 F.2d 516, 520 n.9 (5th Cir. 1974); *Milnarik v. M–S Commodities Corp.*, 457 F.2d 274, 275 n.1 (7th Cir. 1972); *Berman v. Bache, Halsey, Stuart, Shields*, 467 F.Supp. 311, 316 (S.D.Ohio 1979); *Consolo v. Hornblower & Weeks-Hemphill, Noyes, Inc.*, 436 F.Supp. 447, 450–54 (N.D.Ohio 1976). The courts are split as to whether discretionary trading accounts are securities. For example, the Fifth Circuit, in *Moody v. Bache & Co.*, 570 F.2d 523, 526 (5th Cir. 1978), held that "discretionary accounts in commodities futures contracts—as opposed to the futures contracts themselves—may be 'investment contracts' and thus 'securities' for purposes of the securities act." The Seventh Circuit held the contrary in *Hirk v. Agri-Research, Inc.*, 561 F.2d 96 (7th Cir. 1977).

■ It is not necessary for this court to decide whether a discretionary trading account is in fact a security for two reasons. First, the materials on file with the court indicate that the transactions between the plaintiff and defendants were nondiscretionary accounts, and thus under prevailing view not investment contracts. Second, even if the accounts were discretionary and therefore possibly securities, the exclusive jurisdiction provision of the 1974 amendments precludes application of the registration provisions of the securities laws to these transactions. This court is convinced that Congress intended the Commodity Exchange Act, as amended by the 1974 Act, to preempt the regulation of commodity futures trading (with the exception noted above as to the application of Rule 10b–5 to treasury bill futures), and therefore any claim under the registration provisions of the securities laws is barred. *See Hofmayer v. Dean Witter & Co.*, 459 F.Supp. 733, 737 (N.D.Calif.1978), and cases cited therein.

■ Although, as noted above, a treasury bill is a security, that fact alone will not help the defendants with their claim for failure to register the futures accounts, since treasury bills themselves are not required to be registered with the Securities and Exchange Commission.[6]

Summary judgment, therefore, is due to be granted the plaintiff as to Count IV of the counterclaim.

*Conclusion*

Since there exists no genuine issue of material fact, and the plaintiff is entitled to judgment as a matter of law, and for the reasons stated herein, the plaintiff's motion for summary judgment is granted as to Counts II and IV of each of the defendants' counterclaims. Summary judgment, however, is denied as to Count III of the counterclaims.

A separate order in conformity herewith is being entered.

---

**6.** The federal regulations require that government securities such as treasury bills be "registered" with the Department of the Treasury. This registration, however, is merely book registration of ownership. 31 C.F.R. § 306.2(N).