Richard N. ABRAMS, Plaintiff-Appellee,

v.

OPPENHEIMER GOVERNMENT SECURITIES, INC. and James Zurek, Defendants-Appellants.

No. 83–1811.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 6, 1983.

Decided May 30, 1984.

Opinion on remand, D.C., 589 F.Supp. 4.

James E. Beckley, James E. Beckley & Assoc., P.C., Chicago, Ill., for defendants-appellants.

Richard W. Hillsberg, Tishler & Wald, Ltd., Chicago, Ill., for plaintiff-appellee.

Before CUMMINGS, Chief Judge, PELL and WOOD, Circuit Judges.

CUMMINGS, Chief Judge.

This interlocutory appeal presents the issue of whether a Government National Mortgage Association ("GNMA") forward contract constitutes the purchase and sale of the underlying GNMA security and therefore is regulated by the antifraud provisions of the securities laws, even though the GNMA forward contract itself is not a security as defined by the securities laws. We affirm the district court's holding that the antifraud provisions apply.

I

On February 6, 1981, plaintiff Richard Abrams entered into an agreement with defendant Oppenheimer Government Securities, Inc. ("OGS"), for the purchase and delivery of approximately $200,000 of GNMA 30-year, 13% interest, mortgage-backed pass-through certificates (also known as Ginnie Maes). Briefly, the program involves, *inter alia*, the GNMA itself, which is a Government corporation within the Department of Housing and Urban Development, see 12 U.S.C. §§ 1716 *et seq.*, 24 C.F.R. ch. III, private issuers (primarily mortgage bankers), broker-dealers such as defendant OGS, and investors such as plaintiff. The private institutions issue GNMA certificates which evidence an interest in a pool of Government-underwritten residential mortgages. The holder of a GNMA receives a proportion of the income generated as mortgagors in the pool repay their loans, and the timely payment of principal and interest to the GNMA holder is guaranteed by the Government. GNMA's are considered securities (as well as commodities), and like most securities or commodities are freely transferrable from one investor to another. The main objectives

of the program are to increase liquidity in the secondary mortgage market and attract new private sources of funds into residential loans. See *Board of Trade of City of Chicago v. S.E.C.*, 677 F.2d 1137, 1139 (7th Cir.1982), vacated as moot, 459 U.S. 1026, 103 S.Ct. 434, 74 L.Ed.2d 594–595; Dep't of Housing and Urban Development, *Analysis And Report On Alternative Approaches To Regulating The Trading Of GNMA Securities*, vol. I, at 1–15 (1978) (HUD Report).

The agreement entered into by the parties is known as a forward contract. The trade date is the date the contract here was purchased, February 6, 1981, but the settlement date, *i.e.*, the date upon which plaintiff was to remit the balance of the purchase price in exchange for delivery of the GNMA certificates, is May 20, 1981. Delayed delivery is in part a result of the lead time required by the issuer to effectuate the mortgage loans once the issuer receives assurance of a ready market for the GNMA's. To hedge against the possibility of falling interest rates between the date the issuer makes a firm commitment to a home buyer or builder and the date the securities are actually issued, issuers generally sell GNMA forward contracts to broker-dealers such as defendant OGS, who in turn enter into contracts for forward delivery with investors such as Abrams. Because GNMA's (GNMA "actuals") and GNMA forward contracts are fully transferrable from one investor to another, markets for these instruments have evolved, and their value may vary. Purchasers of GNMA forwards such as plaintiff typically speculate that the value of the GNMA certificates will increase. A myriad of factors can influence the market value of GNMA's. Most notably, as a long-term fixed interest security, outstanding GNMA's will become more attractive comparatively and their value will generally (though not necessarily) rise in the event that the prevailing long-term interest rates fall. In such a situation the purchaser of the forward would take delivery of the GNMA securities with a market value exceeding the purchase price. Another avenue is available: though the purchaser is obligated by the forward contract to take delivery of the GNMA's, he may assign his rights and obligations by selling the contract before the settlement date.[1] The same alternatives are of course available in the event the market value falls, the deflated value being reflected in the price if the purchaser sells before the settlement date.

From this somewhat simplified background of GNMA's and GNMA forwards we now turn to the transaction at issue. In the agreement negotiated by the parties, plaintiff orally agreed with defendant James Zurek, an employee of OGS, to provide a "good faith" deposit of 10% of the purchase price. Abrams remitted the deposit of $19,200 on March 10, 1981. Plaintiff then received a demand from OGS on or about April 10 for an additional deposit of $9,647 by April 13. According to the demand letter the additional deposit was necessary "due to a decrease in the market value of the GNMA securities." Plaintiff refused to remit the requested funds on the ground that he had not been informed such demands could be made. The very purpose of the original deposit is also in dispute. According to plaintiff, the good faith deposit was to be applied to the balance of the total GNMA purchase price, with the balance due on the settlement date of May 20, 1981. Defendants assert that "the deposit would be returned after the GNMA forward transaction was completed." Defendants' Reply Br. at 1. Defendants also allege in effect the original agreement contemplated that the amount of the deposit returnable to plaintiff could be reduced to compensate OGS for any loss OGS sustained in the transaction.[2]

---

1. In the forward contract between the parties, par. 11 of the "Standard Terms And Conditions" limits the assignability, wherein it provides that "[t]his agreement cannot be assigned to another party unless agreed to by [OGS]."

2. A letter dated March 4, 1981, from OGS to plaintiff states that the agreement contemplated that "[t]he return of the deposit is plus any profit or less any loss." Plaintiff's App. at 3.

Plaintiff also alleges that Zurek made material misrepresentations in regard to the expected value of the GNMA certificates and their relationship with the prime lending rate. Zurek allegedly represented that the value of a GNMA certificate would increase by six points (*i.e.*, six-hundredths of one percent) for each one point decrease in the prime rate. The origin of this litigation is that while the prime rate declined during the pre-settlement period, so did the market value of the plaintiff's soon-to-be-issued GNMA's, to the extent of approximately seven points since, possibly along with other contributing factors, prevailing long-term interest rates did not fall contemporaneously with the prime rate at this given time. In addition, Zurek, according to plaintiff, told him that "he [Zurek] had never seen the bonds so low and recommended immediate purchase." Plaintiff's Complaint, Count I, par. 9. Finally, plaintiff claims that Zurek told him he would receive 18½% interest on his deposit. Plaintiff claims the deposit accrued interest at a rate of approximately 14½% to 15%.

When plaintiff did not accede to the request for additional funds, OGS sold plaintiff's contract and returned only $1,700 of the deposit, retaining $17,500 on the grounds that plaintiff breached the contract and that the $17,500 fairly compensates OGS for the decrease in the market value of the GNMA securities.

Plaintiff filed a seven-count amended complaint in the district court against defendants Zurek and OGS to recover the $17,500 in dispute. Count I alleges a violation of the Commodity Exchange Act (CEA), 7 U.S.C. §§ 1 *et seq.* Counts II and III claim violations of the antifraud provisions of the federal securities laws. Thus Count II alleges violations of Section 17(a) of the Securities Act of 1933 (SA), 15 U.S.C. § 77q(a), and Section 10(b) of the Securities and Exchange Act of 1934 (SEA), 15 U.S.C. § 78j(b). Count III alleges that defendants violated both SEA Section 10(b) and its adjunct, Securities and Exchange Commission (SEC) Rule 10b-5. Counts IV through VII, invoking the court's pendent jurisdiction, claim respec-

tively that defendants violated the Illinois Securities Law of 1953, Ill.Rev.Stat. ch. 121½, §§ 137.13–137.14, committed common law fraud, acted negligently, and breached their contract with plaintiff.

The defendants moved to dismiss the separate counts on various grounds. Most relevant to this interlocutory appeal are Counts II and III based on the federal securities laws. Defendants argued that the antifraud provisions of the 1933 and 1934 Acts do not apply because a contract to take delivery of a GNMA, *i.e.*, a GNMA forward, is not a security as defined under the Acts. Defendants also alleged that Counts II and III should be dismissed on the ground that Section 17(a) of the 1933 Act, 15 U.S.C. § 77q(a), does not provide plaintiff a private right of action.

In a well-reasoned, unpublished memorandum opinion, Judge Leighton denied defendants' motion to dismiss Counts II and III. The district court acknowledged that GNMA forwards in and of themselves are not securities, but the relevant factual circumstance is that "the parties contracted for the sale of GNMA certificates which are undoubtedly securities." *Abrams v. Oppenheimer Government Securities, Inc.*, No. 82 C 1356, slip op. at 9 (N.D.Ill. Jan. 3, 1982). The antifraud provisions of the securities acts apply to the "purchase" and "sale" of securities, and the court noted that "it is well established that merely contracting to sell securities constitutes a 'purchase' or 'sale' of the underlying securities for purposes of the Securities Acts." *Id.* at 10 (footnote omitted). The court also rejected defendants' claim that no private right of action lies in favor of plaintiff under Section 17(a) of the 1933 Act. *Id.* at 12.

The court granted defendants' motion to dismiss only with respect to Count I and in part to Count IV. Regarding Count I, the court noted that the Commodities Exchange Act applies only to commodities transactions which take place on a formally organized exchange. 7 U.S.C. § 2. The transaction at issue is a GNMA forward,

which unlike a GNMA future is negotiated between the two parties rather than traded on a board of trade or exchange. See generally HUD Report, *supra*, at 32. Regarding Count IV, the court held that plaintiff failed to plead scienter, a prerequisite to liability under the state antifraud provisions.

The district court subsequently granted defendants' motion to certify for interlocutory appeal pursuant to 28 U.S.C. § 1292(b) the question whether, as held below, a GNMA forward is subject to the antifraud provisions of the securities acts, and a panel of this Court granted permission to appeal. For the reasons stated *infra* we affirm.

## II

In deciding this issue, which has not been addressed previously by any federal appellate court, we begin by examining the language of the antifraud provisions. Section 10(b) of the 1934 Act prohibits, *inter alia,* any manipulative or deceptive device "in connection with the purchase or sale of any

security * * *." [3] 15 U.S.C. § 78j(b). Similarly, Rule 10b-5 prohibits material misrepresentations and omissions "in connection with the purchase or sale of any security." 17 C.F.R. 240.10b-5 (1980). Section 3(a) of the 1934 Act, 15 U.S.C. § 78c(a), states that "[t]he terms 'buy' and 'sell' each include any contract to buy, purchase, or otherwise acquire" (par. 13), and that "[t]he terms 'sale' and 'sell' each include any contract to sell or otherwise dispose of" (par. 14). Section 17(a) of the 1933 Act prohibits the making of any untrue statement or omission of material fact "in the * * * sale of any securities * * *." [4] 15 U.S.C. § 77q(a). The term "sale" is defined in Section 2(3) of the 1933 Act to "include every contract of sale or disposition of a security or interest in a security, for value." 15 U.S.C. § 77b(3).

■ From this language, it is apparent that the antifraud provisions apply to the transaction at issue. GNMA certificates are considered securities (exempted from registration [5]) pursuant to Section 2(1) of

---

3. Section 10(b) provides in pertinent part:
Manipulative and deceptive devices
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
   *    *    *    *    *    *
(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
15 U.S.C. § 78j (1981).

4. Section 17(a) provides:
Fraudulent interstate transactions
Use of interstate commerce for purpose of fraud or deceit
(a) It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—
(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.
15 U.S.C. § 77q(a) (1981).

5. GNMA's are exempt securities and need not be registered pursuant to the 1933 Act on the ground that they are "guaranteed by the United States * * * or [issued or guaranteed] by any person controlled or supervised by and acting as an instrumentality of the Government of the United States pursuant to authority granted by the Congress of the United States * * *." SA Section 3(a)(2), 15 U.S.C. § 77c(a)(2). See also SEA Section 3(a)(12), 15 U.S.C. § 78c(a)(12) (GNMA's are exempt securities as "securities which are * * * obligations guaranteed as to principal or interest by[ ] the United States * * * [and] securities issued or guaranteed by corporations in which the United States has a direct or indirect interest * * *."). Registration is otherwise required by SA Section 5, 15 U.S.C. § 77e.

the 1933 Act[6] and Section 3(a)(10) of the 1934 Act,[7] being a "note * * * bond, [or] debenture" with a maturity exceeding nine months. See, *e.g., Davidson v. Dean Witter Reynolds, Inc.,* 478 F.Supp. 494, 495 (D.Colo.1979); *LTV v. UMIC Government Securities, Inc.,* 523 F.Supp. 819, 835 (N.D. Tex.1981), affirmed, 704 F.2d 199 (5th Cir.), certiorari denied, —— U.S. ——, 104 S.Ct. 163, 78 L.Ed.2d 149 (1983); *Fisher v. Dean Witter Reynolds, Inc.,* 526 F.Supp. 558, 559 (E.D.Pa.1981); but see *Marine Bank v. Weaver,* 455 U.S. 551, 102 S.Ct. 1220, 71 L.Ed.2d 409 (certificates of deposit issued by Federal Deposit Insurance Corporation-insured bank are not securities), discussed *infra.* The antifraud provisions apply to the purchase and sale of GNMA securities. *Davidson v. Dean Witter Reynolds, Inc., supra; LTV v. UMIC Government Securities, Inc., supra; Fisher v. Dean Witter Reynolds, Inc., supra.*

■■■■ Accordingly, the parties entered into a contract to purchase and sell GNMA securities and the antifraud provisions are applicable. It is well established that a contract to purchase and sell securities constitutes a purchase or sale of the securities for the purposes of the securities laws. See *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 750–751, 95 S.Ct. 1917, 1932, 44 L.Ed.2d 539. The fact that (1) delivery of the securities was to be delayed pursuant to the contract approximately three months from the date the contract was entered into, and that (2) the contract pertains to "when-issued" securities, *i.e.,* the GNMA securities had not yet been issued by the issuer as of the date the contract was entered into, does not deny the existence of the contract for the purchase and sale of the securities. Neither delivery of nor the passing of title to the contracted-for security is required for the transaction to be considered a "sale" for purposes of the antifraud provisions of the securities laws. *Rubin v. United States,* 449 U.S. 424, 430, 101 S.Ct. 698, 701, 66 L.Ed.2d 633; *Leasco Data Processing Equipment Corp. v. Maxwell,* [1974 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 94,403 (S.D.N.Y.1974); *Commerce Reporting Co. v. Puretec, Inc.,* 290 F.Supp. 715, 718 (S.D. N.Y.1968). The forward contract at issue has a sufficient nexus with the underlying GNMA certificates to characterize the contract as a contract to "purchase," "acquire," "sell," or "otherwise dispose of" the GNMA certificates. The terms of the

6. Section 2(1) of the 1933 Act provides:
   The term "security" means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.
   15 U.S.C. § 77b(1) (1983) (amended 1982).

7. Section 3(a)(10) provides:
   (10) The term "security" means any note, stock, treasury stock, bond, debenture, certifi-

cate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or in general, any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.
15 U.S.C. § 78c(a)(10) (1983) (amended 1982).

contract obligate Abrams to take delivery of the GNMA's (or assign his rights and obligations to a party approved by OGS) on the settlement date, and entitle the purchaser to payment of principal and interest on the 15th of each month following settlement. The contract at issue is therefore a firm commitment to take delivery, as opposed to a GNMA standby commitment which gives the seller the right to deliver to the buyer only if the seller so desires. Moreover, although lacking specificity in regard to the terms of the requisite deposit, the contract is definite and specific with respect to such terms as the coupon (interest rate), price, trade date, settlement date, and effective annual yield of any replacement GNMA's in the event that the Federal Housing Authority mortgage rate is changed during the term of the commitment. Finally, the general conditions of the agreement, though unlike the above terms are not agreed upon individually by the parties but instead are standard OGS language, repeatedly refer to the transaction as the purchase and sale of securities.[8] Accordingly, the contract is clearly a contract to purchase and sell the GNMA certificates, and the antifraud provisions of the securities laws apply to the transaction.

■ Such a conclusion is firmly principled upon the literal reach of the "purchase" and "sale" language found in the securities acts and is not vitiated by the fact that the 1933 Act does not require GNMA forwards to be registered since they are not considered securities apart from the underlying GNMA's. We concur without elaborate discussion with the generally accepted proposition that GNMA forwards in and of themselves are not securities. See, *e.g., Securities and Exchange Commission v. G. Weeks Securities*, 678 F.2d 649, 652 (6th Cir.1982); *Plymouth-Home National Bank v. Oppenheimer & Co.*, [1982–1983 Transfer Binder] Fed.Sec.

L.Rep. (CCH) ¶ 99,265 (N.D.Ill.1983); *Berk v. Oppenheimer & Co.*, No. 82 C 4928 (N.D.Ill. Feb. 18, 1983) (unpublished opinion); *ABM Industries, Inc. v. Oppenheimer Government Securities, Inc.*, [Current] Fed.Sec.L.Rep. (CCH) ¶ 99,435 (N.D.Ill.1983) (reconsidering *ABM, Industries, Inc. v. Oppenheimer Government Securities, Inc., id.* at ¶ 99,434); *Bache Halsey Stuart, Inc. v. Affiliated Mortgage Investments, Inc.*, 445 F.Supp. 644, 647 (N.D.Ga.1977). Plaintiff does not dispute this classification and the issue is not before us on appeal. Implicit in plaintiff's position is the recognition that the various provisions of the securities laws are not necessarily identical in scope or purpose. For example, regarding the antifraud and registration provisions, the former applies to GNMA's as well as to GNMA forwards as the forward purchase and sale of GNMA's, and the latter applies to neither GNMA's (as exempted securities) nor GNMA forwards (as non-securities). An analogous observation was made in *Daniel v. International Brotherhood of Teamsters, Chauffeurs, etc.*, 561 F.2d 1223 (7th Cir.1977), reversed on other grounds, 439 U.S. 551, 99 S.Ct. 790, 58 L.Ed.2d 808, in which this Court held that the antifraud provisions of the securities laws apply to pension funds even though such funds are exempt from the registration requirements of the 1933 Act. There we noted that:

[Defendants] confuse the requirements of the 1933 Act's registration provisions with the anti-fraud provisions of the 1933 and 1934 Acts. The registration provisions are designed to assure that investors will be furnished with all material information concerning an informed investment decision. * * * In contra-distinction, the anti-fraud provisions do not establish an affirmative disclosure system requiring the filing of documents. Rather the anti-fraud provisions are essentially a generalized self-executing prohibition against fraudulent activity. * *

---

**8.** Similarly, a letter dated March 4, 1981 from OGS to plaintiff regarding the deposit begins, "On your recent purchase of Government National Mortgages [*sic*] Association Modified Pass-thru Securities * * *." Plaintiff's App. at

**3.** Further, the demand letter from OGS for the additional good faith deposit refers to "the GNMA securities you bought for delivery 5/20 * * *." *Id.* at 6.

The fact that the SEC has historically advocated a hands-off approach to the regulation of pension plans with respect to disclosure requirements holds no brief for exempting pension plans from the anti-fraud provisions of the securities acts. * * * Although banks and life insurance companies are subject to stringent regulation, bank securities and insurance variable annuities and flexible funds are subject to the anti-fraud rules of the securities acts, even though they are sometimes exempt from the registration regulations of the acts [footnotes and citations omitted].

561 F.2d at 1247–1248. Accord *Davidson v. Dean Witter Reynolds, Inc.*, 478 F.Supp. 494, 495 (D.Colo.1979); *Sohns v. Dahl*, 392 F.Supp. 1208, 1218–1219 (W.D.Va.1975). Unlike the pension funds in *Daniel* the GNMA forwards are considered non-securities rather than exempt securities, but the logic of *Daniel* applies with force, *viz.*, the various policies underlying the securities acts as applied to a particular transaction are not necessarily coextensive in scope.

Judge Leighton in ruling upon defendants' motion to dismiss acknowledged that GNMA forwards are not in and of themselves securities, but correctly surmised that "merely contracting to sell securities constitutes a 'purchase' or 'sale' of the underlying securities for purposes of the Securities Acts," citing *Blue Chip Stamps v. Manor Drug Stores* and *Rubin v. United States, supra. Abrams v. Oppenheimer Government Securities, Inc.*, No. 82 C 1356, slip op. at 10 (N.D.Ill. Jan. 3, 1982). Other district courts have considered this very issue and similarly have held that GNMA forward contracts are subject to the antifraud provisions of the securities acts. See *Plymouth-Home National Bank v. Oppenheimer & Co., supra; Berk v. Oppenheimer & Co., supra; ABM Industries v. Oppenheimer Government Securities, Inc., supra; Fisher v. Dean Witter Reynolds, Inc.*, 526 F.Supp. 558, 559 (E.D.Pa.1981). As Judge Kocoras observed in *ABM Industries, supra:*

The firm commitment contract is, in effect, a transaction in GNMA's. The buyer does not get his GNMA's immediately, but both he and the seller are locked into a price and they are both committed to carry out the transaction on the settlement date. Neither the delivery of the certificates nor their acceptance by the buyer is optional. The reality of the situation is that there has been a transaction in GNMA's on the date when the parties execute the firm commitment contract, even though the cash and the GNMA's will not actually change hands until a future date.

*ABM Industries, Inc. v. Oppenheimer Government Securities, Inc.*, [Current] Fed.Sec.L.Rep. (CCH) ¶ 99,435, at p. 96,490 (N.D.Ill.1983). The sound rationale behind *ABM Industries* and cases similarly holding that GNMA forward contracts constitute a purchase and sale of GNMA securities is not impugned by the decision in *P & C Investment Club v. Becker*, 520 F.Supp. 120 (E.D.Pa.1981), relied upon heavily by defendants. We will address *P & C Investment Club*, which involved the purchase of treasury bill futures, after a necessary explication of the distinctions between forwards and futures contracts and defendants' assertion that a SEC–CFTC jurisdictional dispute is at issue in this case.

■ Defendants assert that if the contract at issue is deemed to constitute a contract for the purchase and sale of securities for purposes of the antifraud provisions, such a holding would encroach upon the jurisdiction of the Commodity Futures Trading Commission (CFTC). We find no merit in this assertion. The CFTC does not possess any statutory authority to regulate the trading of GNMA forward contracts. The "Treasury Amendment" of 1974 to the CEA provides in pertinent part:

Nothing in this chapter shall be deemed to govern or in any way be applicable to transactions in foreign currency, security warrants, security rights, resales of installment loan contracts, repurchase options, government securities, or mortgages and mortgage purchase commitments, unless such transactions involve the sale

**590**

thereof for future delivery conducted on a board of trade.

7 U.S.C. § 2. Forward contracts by definition are traded through party-to-party negotiation (over the counter), unlike futures which are traded on an organized exchange. The legislative history behind the 1974 amendment indicates the Treasury Department was concerned that the CFTC might exceed its jurisdiction in regulating financial instruments such as GNMA forwards which are not traded on an organized exchange.[9] See S.Rep. No. 93–1131, 93d Cong., 2d Sess., reprinted in [1974] U.S.Code Cong. & Ad.News 5843, 5863, 5889. Our holding therefore does not in any way intrude upon CFTC jurisdiction.[10]

Defendants also assert that in effect GNMA futures are essentially indistinguishable from GNMA forwards, and therefore applying the antifraud provisions to GNMA forwards but not to GNMA futures is an untenable distinction. We agree with defendants that both forwards and futures are "derivative" contracts created for the purposes of shifting risk, and that both at least in theory obligate the purchaser to take delivery of a commodity such as GNMA's[11] at some date in the future. Yet the fundamental distinction remains that GNMA futures are traded on an organized exchange and are subject to CFTC jurisdiction, whereas GNMA forwards are not. As a result, GNMA futures are highly standardized, whereas the critical terms of GNMA forwards are the result of negotiation between purchaser and broker-dealer. See HUD Report, *supra*, at 111, 131. Forward contracts allow purchasers to negotiate, *inter alia*, the quantity of the commodity (and, in the case of tangible good commodities, the grade or purity), the time and place of delivery, the manner of payment, and deposit or margin requirements, the latter being a primary subject of dispute between the parties in the underlying litigation herein. See Note,

9. The CFTC's jurisdiction in regulating financial instruments was further limited in 1982 when Congress granted the SEC jurisdiction to regulate "any put, call, straddle, option, or privilege on any security * * * or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to * * * any instrument commonly known as a 'security' * * *." 15 U.S.C. §§ 77b(1), 78c(a)(10). Accordingly, the Commodity Exchange Act was amended to provide that "the [CFTC] shall have no jurisdiction to designate a board of trade as a contract market for any transaction whereby any party to such transaction acquires any put, call, or other option on one or more securities * * *." 7 U.S.C. § 2a(i) (1983). The CFTC retains its exclusive jurisdiction regarding GNMA futures, not forwards or options, *i.e.*, "transactions involving contracts of sale of a commodity for future delivery, traded or executed on a * * * board of trade [or] exchange * * *." 7 U.S.C. § 2. Defendants seek to inject as an issue the SEC–CFTC jurisdictional conflict antedating these amendments regarding whether GNMA options may be traded on the Chicago Board Options Exchange (subject to SEC jurisdiction) or on the Chicago Board of Trade (subject to CFTC jurisdiction). See *Board of Trade of City of Chicago v. S.E.C.*, 677 F.2d 1137 (7th Cir. 1982), vacated as moot, 459 U.S. 1026, 103 S.Ct. 434, 74 L.Ed.2d 594–595. The jurisdictional issue pertaining to the trading on organized exchanges of financial instrument options such as GNMA options is distinct from our instant inquiry and we need not address it herein.

10. For a discussion of the jurisdictional overlap and dispute between the SEC and the CFTC with respect to GNMA futures, see Note, *The GNMA Securities Market: An Analysis Of Proposals For A Regulatory Scheme*, 9 Fordham Urb.L.J. 457 (1980):

[The CFTC] has exclusive jurisdiction over transactions involving contracts of sale of a commodity for future delivery traded or executed on a contract market. The regulation of commodity futures, not government securities, is the primary function of the CFTC. However, section 2(1) of the 1933 Act defines the term "security" to include any right to purchase a security. Because a GNMA futures contract is a right to a purchase a GNMA security, arguably both agencies have jurisdiction over GNMA futures contracts [footnotes omitted].

*Id.* at 464.

11. Congress expanded the definition of commodity to include financial instruments such as GNMA certificates in response to industry's desire to trade in their derivatives. 7 U.S.C. § 2 (1974) (amended 1983). See generally *Board of Trade of Chicago v. S.E.C.*, 677 F.2d 1137, 1140 n. 2 (7th Cir.1982). Thus GNMA's are both securities and commodities and, to recapitulate, the CFTC's jurisdiction over the trading of GNMA derivatives is now limited to GNMA futures and options on GNMA futures.

*The GNMA Securities Market: An Analysis Of Proposals For A Regulatory Scheme*, 9 Fordham Urb.L.J. 457, 463 n. 29 (1980) ("GNMA forward contracts must be distinguished from GNMA futures contracts, which are standardized commodities contracts traded on a Board of Trade."). In addition, many investors are deterred from directly participating in GNMA futures trading on organized exchanges due to the complexity of internal exchange rules or simply due to the limited nature of their investment activities. See HUD Report, *supra*, at 133.

Moreover, futures and forwards differ in the purpose of the investment and expectations of the investors. The vast majority of GNMA futures contracts are traded without the commodity ever being ultimately delivered. Indeed, futures markets generally are not used to obtain actual delivery of a commodity. Most contracts are discharged by entering into an offsetting contract, *e.g.*, the seller of a futures contract will later purchase a future of the same commodity, hoping in the interim that the price at which he sold is greater than the price at which he will buy. Such speculation generates profit for those who speculate accurately. Empirical data suggest that fewer than 3% of all futures contracts are fulfilled by taking (or making) actual

delivery of the underlying commodity. *Commodities Futures Trading Commission Act of 1974: Hearings on H.R. 11955 Before the House Committee on Agriculture*, 93d Cong., 2d Sess. 238 (1974) (statement of Sen. R. Clark); see Clark, *Genealogy and Genetics of "Contract of Sale of a Commodity For Future Delivery" in the Commodity Exchange Act*, 27 Emory L.J. 1175, 1176 (1978). In contrast, the purchasers of forwards generally adopt a more long-term position, often actually taking delivery of the underlying commodity.[12] See *In re Rawlin L. Stowall*, [1977–1980 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 20,941 (CFTC Opinion Dec. 6, 1979); Feldman & Sommer, *The Special Commodity Provisions of the New Bankruptcy Code*, 37 Bus.Law. 1487, 1492–1493 (1982).

These crucial distinctions[13] were observed in *Bache Halsey Stuart, Inc. v. Affiliated Mortgage Investments, Inc.*, 445 F.Supp. 644, 646 (N.D.Ga.1977), wherein the court commented:

> [T]he transactions in question must be distinguished from sales of GNMA futures contracts which are presently being traded on the Chicago Board of Trade. The Board of Trade transactions are highly standardized; the futures contracts are sold at an auction, with the only open term in the transaction being

---

12. Plaintiff does not specifically assert that he without question would have taken delivery of the GNMA's but for the alleged fraudulent misrepresentations of defendants. Nor does the record indicate that plaintiff is a commercial purchaser of GNMA's who regularly takes delivery. Irrespective of plaintiff's possible intention to sell the GNMA forward prior to settlement given favorable market conditions, it is undeniable that the contract is a firm commitment which by its terms obligates plaintiff to take delivery in the event that no offsetting contract is purchased. By its terms the contract is a contract for the purchase and sale of GNMA's, and delivery of the securities is not a prerequisite to the formation of such a contract. *Rubin v. United States, supra.*

13. Defendants themselves have suggested in a memorandum filed in the district court that for jurisdictional purposes a material distinction exists between GNMA forwards and GNMA futures. In response to plaintiff's argument that GNMA forwards are a commodity and that the

CEA also governs this transaction, defendants observed:

> [N]o contract market or board of trade is involved in a GNMA forward transaction. The funds required to apply for a GNMA certificate are typically assembled by a mortgage lender, and private parties are permitted to negotiate a contract to buy those certificates in the future to gain a profit from their price fluctuations. A GNMA forward transaction is never "related" or "involved" with a board of trade or contract market. A GNMA forward could not be related to a board of trade by its definition.
> \* \* \* \* \* \*
> The contract here was negotiated directly between Plaintiff and Defendant. No third party or contract market was involved or related in any manner to the transaction [footnotes omitted].

Defendants' Reply to Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss, at 2 and n. 2.

the price. Delivery is very rarely taken in such transactions. In the forward contracts under consideration, the parties negotiate all the terms of the sale, including the interest rate, date of delivery, and price, and the purchaser most often takes actual delivery of the underlying certificate. Transactions involving futures contracts require the participation of a clearing house which buys from the seller and sells to the buyer; forward contracts, or contract for delayed delivery, are negotiated directly between the buyer and seller, and no third party is ever involved. Futures contract trading may be carried on through a discretionary account managed by a broker-dealer; the forward contracts involved here require party-to-party negotiation. The current dispute between the SEC and the Commodities Futures Trading Commission (CFTC) concerns jurisdiction over futures contracts trading and possible registration and does not bear on the issue presently before the Court.

The issue before the court in *Bache Halsey Stuart* is not before us, *viz.*, whether GNMA forwards must be registered under the 1933 Act, but the court's above-stated rationale is pertinent. Thus there are sufficient distinctions between GNMA forwards and GNMA futures to support plaintiff's position that they may be treated differently for purposes of the securities laws.[14]

The decision in *P & C Investment Club v. Becker*, 520 F.Supp. 120 (E.D.Pa.1981), relied upon by defendants, does not mandate a different outcome. There plaintiff purchased futures contracts in treasury bills. Analogizing this transaction to the purchase of tangible commodities such as cotton, the court held that the futures were not securities. Based upon this conclusion the court ruled that the transaction was not subject to the antifraud provisions or other regulations of the 1934 Act, and therefore plaintiff could not maintain a suit under the 1934 Act based on the alleged fraudulent omissions and misrepresentations of defendants.

*P & C Investment Club* is not controlling in this case. As discussed *supra*, actual delivery is rarely taken by purchasers of futures; therefore in practice there is a looser nexus in the futures context between the purchase of a futures contract and the underlying commodity. Futures and forwards differ in other important respects insofar as futures contracts are highly standardized and do not involve party-to-party negotiation. See, *e.g., Bache Halsey Stuart, supra.* Moreover, treasury bill futures such as those at issue in *P & C Investment Club* are traded on an organized exchange, there the defendants trading the futures held in plaintiff's account on behalf of plaintiff. Implicit in the rationale of *P & C Investment Club* is the recognition that futures contracts are regulated by the CFTC and not the SEC; indeed, the plaintiff in that case also pleaded a count under the CEA and the court denied the defendants' motion to dismiss that count. Moreover, even if the important distinctions between GNMA forwards and GNMA futures are overlooked, the reasoning in *P & C Investment Club* has been

---

**14.** We note that three courts recently presented with allegations of fraud in connection with the trading of financial instrument derivatives have construed the antifraud provisions more expansively than we need to consider here. In *Paine, Webber, Jackson & Curtis, Inc. v. Conaway,* 515 F.Supp. 202 (N.D.Ala.1981), the court held that alleged fraud in the sale of treasury bill futures is cognizable under Rule 10b–5. The court observed that, under *Rubin v. United States, supra,* it is not essential that full title pass to a transferee for the transaction to be a "sale" under the antifraud provisions of the securities acts. 515 F.Supp. at 210. See also *Fisher v. Dean Witter Reynolds, Inc.,* 526 F.Supp. 558, 559–560 (E.D.

Pa.1981) (antifraud provisions apply to purchase and sale of GNMA and treasury bill futures). And in *LTV v. UMIC Government Securities, Inc.,* 523 F.Supp. 819, 835 (N.D.Tex.1981), affirmed, 704 F.2d 199 (5th Cir.), certiorari denied, — U.S. —, 104 S.Ct. 163, 78 L.Ed.2d 149 (1983), the court ruled that a GNMA standby commitment was subject to the antifraud provisions of the securities acts. A standby commitment unlike a firm commitment is a "put" option in the sense that the seller has the right to deliver the GNMA's if the seller elects to do so. Thus ultimate delivery of the underlying GNMA securities is highly unlikely in the event the value increases.

criticized by another court in the Eastern District of Pennsylvania. As the court observed in *Fisher v. Dean Witter Reynolds, Inc.,* 526 F.Supp. 558 (E.D.Pa.1981), discussed at note 14 *supra,* the court in *P & C Investment Club* ignored the express language of the securities acts:

I respectfully disagree [with *P & C Investment Club* ]. Because section 3(a), 15 U.S.C. § 78c(a), states that the terms "purchase" and "sell" refer also to *contracts* to purchase and sell, it suffices that the interest-rate futures contract is a contract for the sale of the underlying security. It is not necessary that the contract itself qualify as a security.

*Fisher, supra,* 526 F.Supp. at 560. We find the logic of *Fisher* compelling, though we need not and do not extend our holding to futures as well as to forwards. The transaction in this case is based upon a forward contract for the purchase and sale of securities, therefore the purchase and sale requirement is satisfied.

Closely related to the purchase and sale requirement of the security antifraud provisions is the "in connection with" requirement, *i.e.,* Section 10(b) of the 1934 Act and Rule 10b–5 proscribe fraud "in connection with the purchase or sale of any security." In *Superintendent of Insurance v. Bankers Life & Casualty Co.,* 404 U.S. 6, 12, 92 S.Ct. 165, 169, 30 L.Ed.2d 128, the Supreme Court held that this phrase "must be read flexibly, not technically and restrictively." Subsequent decisions have similarly held that the "in connection with" requirement amounts to some nexus but not necessarily a direct and close relationship. See, *e.g., Chemical Bank v. Arthur Andersen & Co.,* 552 F.Supp. 439, 450–454 (S.D.N.Y. 1982) *Brown v. Ivie,* 661 F.2d 62, 65 (5th Cir.1981), certiorari denied, 455 U.S. 990, 102 S.Ct. 1614, 71 L.Ed.2d 850.

Under this standard, the "in connection with" requirement is easily satisfied in this case. As discussed *supra,* the purchase and sale of a GNMA forward contract is inextricably tied to the purchase and sale of the underlying GNMA. Moreover, the allegedly fraudulent misrepresentations of OGS and Zurek pertained to (1) the relationship between the prime lending rate and the value of GNMA's, (2) the deposit requirements on the contract, and (3) the interest on the deposit. According to the record these representations were apparently made at or around the time the contract was entered into, and all three representations have a nexus with Abrams' purchase. Therefore the "in connection with" requirement has been met. See *Plymouth-Home National Bank v. Oppenheimer & Co., supra; ABM Industries, Inc. v. Oppenheimer Government Securities, Inc., supra* ("in connection with" requirement satisfied regarding alleged fraudulent misrepresentations in sale of GNMA forwards). We intimate no opinion, however, regarding the underlying merits of this case, including the questions whether defendants' conduct was fraudulent and whether the allegedly fraudulent misrepresentations were material within the meaning of the antifraud provisions and *TSC Industries v. Northway, Inc.,* 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757.

Finally, defendants argue that *Marine Bank v. Weaver,* 455 U.S. 551, 102 S.Ct. 1220, 71 L.Ed.2d 409, mandates reversal in this case. In *Marine Bank* the Supreme Court considered whether a certificate of deposit issued by petitioner bank, with a six-year maturity and insured by the Federal Deposit Insurance Corporation, was a security for purposes of the antifraud provisions. The Court held it was not, finding the certificate of deposit distinguishable in character from other long-term debt obligations which are classified as securities. Most crucially, the Court emphasized that the certificate of deposit is insured by the Federal Deposit Insurance Corporation. The holder is virtually guaranteed payment of principal and interest in full, whereas the holder of an ordinary long-term debt obligation assumes the risk of the debtor's insolvency. *Marine Bank v. Weaver,* 455 U.S. at 558, 102 S.Ct. at 1224. In addition, the Court noted that deposits in federally regulated banks are protected by the reserve, reporting, and inspection requirements of the federal banking laws. *Id.*

The holding of *Marine Bank*, contrary to defendants' position, is of negligible importance in this case. The issue before us is not whether GNMA certificates are properly considered securities, or even whether GNMA forwards are in and of themselves securities. Defendants do not urge us to reverse the generally accepted view that GNMA certificates are securities, and plaintiff does not contest the holding of the district court and other courts presented with the issue that GNMA forwards are not securities. The precise issue before us is whether the agreement effected by the parties constitutes a purchase and sale of GNMA securities notwithstanding the fact that the agreement is also a GNMA forward contract. This issue was not addressed in *Marine Bank* and consequently *Marine Bank* does not help defendants.

In sum, we affirm the district court's holding that the purchase of GNMA forwards is in connection with the purchase and sale of the underlying GNMA securities, and therefore the antifraud provisions of the securities laws apply to the purchase and sale of GNMA forwards. In addition to this principal issue, defendants also raise the issue of implied private rights of action under the 1933 Act. Defendants urge reversal of the district court's holding that plaintiff has an implied private right of action under Section 17(a) of the 1933 Act. For us to reach this distinct issue, however, would impermissibly expand our limited jurisdiction in this interlocutory appeal. The sole issue certified for interlocutory appeal by the district court is whether the transaction at issue is in connection with the purchase and sale of GNMA securities thereby subjecting the transaction to the antifraud provisions. Whether private parties may sue under Section 17(a) of the 1933 Act has not been certified for interlocutory appeal, so that we may not address the issue. Costs to plaintiff.