**Jerome and Betty ABELES, and all others similarly situated, Plaintiffs-Appellants,**

v.

**OPPENHEIMER & CO., INC., and Oppenheimer Government Securities, Inc., Defendants-Appellees.**

No. 86–1511.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 4, 1986.

Decided Nov. 24, 1987.

Steven I. Berlin, Altheimer & Gray, Chicago, Ill., for plaintiffs-appellants.

James E. Beckley, James E. Beckley & Assoc., Chicago, Ill., for defendants-appellees.

Before BAUER, Chief Judge, FLAUM, Circuit Judge, and REYNOLDS, Senior District Judge *.

BAUER, Chief Judge.

Plaintiffs, Jerome and Betty Abeles, (the "Abeleses"), appeal from the district court's grant of summary judgment for the defendants and its dismissal of their complaint. At issue is whether the defendants, Oppenheimer & Co., Inc., and Oppenheimer Government Securities, Inc. (collectively "Oppenheimer") extended credit to plaintiffs when the parties entered into an agreement for the purchase and sale of Government National Mortgage Association certificates ("GNMA forwards"). Plaintiffs claim that as part of this agree-

* The Honorable John W. Reynolds, Senior District Judge for the Eastern District of Wisconsin is sitting by designation.

ment, the defendants extended them credit, but failed to disclose the credit terms as required by Rule 10(b)(16) of the Securities and Exchange Commission (the "SEC"). The district court found that there was no extension of credit and thus, no violation of Rule 10(b)(16), because there was no debt obligation to pay the purchase price due and owing on the trade date. We affirm.

## I.

On January 19, 1981, plaintiffs executed a "Confirmation and Agreement" (the "Agreement") to purchase GNMA forwards in the amount of $100,000. Oppenheimer promised to deliver GNMA's in that amount. The parties agreed to perform these promises on March 19, 1981. As part of the Agreement, plaintiffs were obliged to and did make a good faith deposit equal to ten percent of the GNMA's face value. The Agreement expressly reserved to Oppenheimer the right to alter the deposit amount to insure against the plaintiffs' non-performance.

After January 19, 1981, the market price for GNMAs declined. Oppenheimer called upon the plaintiffs to increase the good faith deposit. When the required increase was not forthcoming, Oppenheimer closed out the plaintiffs' position at a loss and plaintiffs brought suit against Oppenheimer.

### GNMA Forwards

A GNMA certificate represents an interest in a pool of government-underwritten residential mortgages. The GNMA, an agency of the federal government, guarantees timely payment of the mortgage principal and interest. GNMAs have fairly standardized terms and therefore may be pooled and marketed for investment. The issuers are usually mortgage bankers who earn their compensation by organizing pools of GNMAs.

The profitability of a GNMA is directly related to the market interest rate for similar term investments. Because it normally takes months to organize a pool of GNMAs, the issuers are subject to the risk that the market interest rate might rise,

and lessen the value of the pool before it is organized for sale. To avoid this risk, issuers sell forward contracts; they contract to deliver GNMA certificates on a future date (the "settlement date"), with an interest rate fixed on the date of the contract (the "trade date").

There are obvious risks involved in such an investment. There is a risk that the market price of GNMAs will decline, forcing the investor to take delivery of GNMAs at a below-market rate. There is also a risk, borne by both investor and broker, that the other party will not perform on the settlement date. This risk is tied to the risk of market fluctuation, and the concomitant profitability of the investment.

To insure against the risk of non-performance, the broker requires that the buyer deposit a sum of money to be forfeited in the event of non-performance. The amount of deposit varies depending on the profitability of the investment during the period between the trade and settlement dates. The deposit insures that the broker will not bear the loss if the investor fails to perform. In the event that this happens, the broker can take delivery and sell the GNMA on the open market. The income from the sale combined with the deposit will make the broker whole. The issue here is whether the unpaid balance by the Abeleses constitutes an extension of credit by Oppenheimer such that Oppenheimer had to satisfy the requirements of Rule 10(b)(16).

## II.

Plaintiffs first argue that there was an extension of credit arising out of their agreement to purchase GNMA forwards both as a matter of law and as a matter of factual inference. They argue that defendants violated Rule 10(b)(16) by failing to provide plaintiffs with a written statement of the conditions under which Oppenheimer would require that plaintiffs increase their deposit. In addition, the plaintiffs argue that Oppenheimer should have made them aware of the consequences of default—that Oppenheimer would liquidate their account

before the settlement date if they failed to deposit additional cash. Defendants' duty to make this disclosure turns on whether Oppenheimer actually extended credit to the Abeleses between the trade date and the settlement date. If no extension of credit was made, Rule 10(b)(16) is not triggered and thus, no disclosure was mandated. Plaintiffs argue that when Oppenheimer sold them GNMAs, (whether certificates or forwards), but did not require full payment until the settlement date, that Oppenheimer extended them credit in the amount of the purchase price balance for 150 days. Accordingly, plaintiffs argue that the good faith deposit was security for the debt created. They rely on *Abrams v. Oppenheimer Government Securities, Inc.*, 737 F.2d 582 (7th Cir.1984) to bolster their argument that an obligation and debt arose on the trade date. *Abrams* holds that a GNMA forward contract constitutes a purchase and sale of a security and is therefore regulated by the anti-fraud provisions of the securities laws, particularly Section 10(b) of the Securities Exchange Act of 1934. *Abrams,* however, does not address the question posed here. The essential determination here is not whether a purchase and sale of a security occurred, but when a debt arose.

Plaintiffs confuse the concepts of an obligation to pay and a debt which is due and owing. While it is true that plaintiffs were obligated to carry out the transaction, the payment of the purchase price and exchange of the certificates would not occur until the settlement date. On the trade date, there was an obligation to defendants to purchase at a later date, not a debt due and owing to the defendants. Plaintiffs' transaction, therefore, constitutes an executory contract, not a margin transaction in which Oppenheimer loaned them money. Moreover, Oppenheimer did not maintain the GNMA certificates for the Abeleses since it is undisputed that the underlying GNMA certificates were not in existence at the time of the purchase.

Plaintiffs' reliance on statements by and records of Oppenheimer treating the deposit as a margin is misplaced. Margin is the minimum amount that a securities purchaser must deliver to his broker before title to the securities is passed to him. "The securities margin ... has two significant features: (1) the buyer [is] conveyed title to the securities immediately despite an unpaid balance; and (2) the broker ... extends credit to the new owner for the remainder of the purchase price." Johnson, *Commodities Regulation,* § 1.10. On the trade date, Oppenheimer had not purchased the GNMA certificates, and thus did not transfer title to plaintiffs. Indeed, the pool from which Oppenheimer would draw the certificates was not yet in existence on the trade date. Next, no extension of credit existed because the plaintiffs had no obligation to pay Oppenheimer the purchase price. Thus, this transaction was not a margin transaction. Plaintiffs' deposit is similar to a performance bond designed to insure that the parties live up to their obligations at a future date.

This ruling is supported by the policy underlying Rule 10(b)(16). Securities and Exchange Commission Release No. 34–8773, 34 Fed.Reg. 19717 (December 16, 1969), announcing the adoption of Rule 10(b)(16), explained that the rule requires "broker dealers who extend credit to customers to finance securities transactions to furnish specified information with respect to the amount of and reasons for the credit charges." Plaintiffs' deposit was not part of a financing arrangement, and there were no credit charges.

Our decision is also in accord with the parallel provisions of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.,* after which Rule 10(b)(16) is patterned. *Liang v. Dean Witter & Co.,* 540 F.2d 1107, 1111 (D.C.Cir.1976). The TILA defines "credit" as "... the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment." 15 U.S.C. § 1602(e). Since no debt was due on the trade date, there was no deferral of a debt payment and thus, no extension of credit under the TILA.

Oppenheimer did not extend credit to the Abeleses and thus, Oppenheimer did not violate Rule 10(b)(16) because no debt obligation to pay existed on the trade date.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.

REYNOLDS, Senior District Judge, dissenting.

I disagree with the majority, not on the law, but on the facts. The issue is what in fact is "credit." The record below contains no economic or accounting expert testimony indicating what "credit" is; so we are left on our own to define it. In the context of this case "credit" is the loaning of money to a debtor on terms for repayment. The securities are "GNMA forwards" (not to be confused with "GNMA securities"). The "GNMA forwards" were sold to the Abeleses on terms of credit that were not fully disclosed as required by Rule 10(b)(16) of the Securities and Exchange Commission.

The "GNMA forwards" were originally bought by Oppenheimer from investment bankers and then sold to the Abeleses at a marked-up price. The mark-up was high enough not only to include what is thought of as profit but also interest on the unpaid portion of the purchase price. Oppenheimer pretended to pay interest to the Abeleses on the down payment in order to deceive them, i.e. this was done as a sales technique to lure them into believing that they were earning money on their "investment." It was a tricky and deceptive way of selling these "GNMA forwards."

Unbeknownst to the Abeleses, after they bought the "GNMA forwards" Oppenheimer checked their market value at least weekly, and when the market value fell Oppenheimer called for more money. When more money was not forthcoming, it sold out the "GNMA forwards." Under this arrangement, the Abeleses unknowingly assumed the entire risk of a fall in the market value of the "GNMA forwards," i.e. if the market value of the "GNMA forwards" went down then they had to come up with more money or lose their investment. The district court assumed that because Oppenheimer did not charge "interest on the amount that they advanced," that it was not an extension of credit. The fact that Oppenheimer did not set forth the cost of money that was advanced to the Abeleses does not mean that Oppenheimer was not being compensated for the use of their money.

In particular, I would like to comment on the following statements in the majority opinion.

(1) "The district court found that there was no extension of credit and thus, no violation of Rule 10(b)(16), because there was no debt obligation to pay the purchase price due and owing on the trade date."

On the trade date, January 19, 1981, the debt was owing; on the settlement date, March 19, 1981, it was due but there was also an obligation to pay the purchase price on the happening of other events such as the sale of the "GNMA forwards" which the Abeleses had the right to do before the settlement date or the sale of the "GNMA forwards" by Oppenheimer when their market value went down. The right of Oppenheimer to sell on the declining of the market was not disclosed to the Abeleses.

(2) "There is also a risk, borne by both investor and broker, that the other party will not perform on the settlement date."

There was no risk borne by Oppenheimer. The risk was entirely borne by the Abeleses, and this risk was that if the market value of the "GNMA forwards" between the trade date and the settlement date went down, then the Abeleses would have to come up with more money or allow Oppenheimer to sell their securities. There was in fact no risk of nonperformance on the part of the Abeleses, because the "GNMA forwards" could be sold by the Abeleses on the "GNMA forwards" market before the settlement date if the market went up, in which case Oppenheimer would be paid in full or Oppenheimer would sell the "GNMA forwards" if the market went down, in which case Oppenheimer would be paid in full, and if neither of these events took place, Oppenheimer would be paid in full on the settlement date. Oppenheimer could not lose.

(3) "The amount of deposit varies depending on the profitability of the invest-

ment during the period between the trade and settlement dates."

This is incorrect. Undisclosed to the Abeleses, the amount of deposit only varied if the market value of the "GNMA forwards" as of any given date between the trade date and the settlement date went down, in which case Oppenheimer would call for a larger deposit.

(4) "Accordingly, plaintiffs argue that the good faith deposit was security for the debt created."

This misstates the plaintiffs' position. The deposit was for the purchase of the "GNMA forwards," and the "GNMA forwards" were the security for the unpaid portion of the purchase price, i.e., the debt.

(5) "Plaintiffs confuse the concepts of an obligation to pay and a debt which is due and owing."

This assumes that the debt was not due and owing until the settlement date, and under the arrangement in this case, that was not true. The debt also became due and owing at the time of certain other events; that is the date the Abeleses sold their "GNMA forwards," if they did, or at the time the market value of the "GNMA forwards" dropped more than the amount of the deposit—and as stated so many times in this dissent, the Abeleses were never told about this latter possibility.

(6) "Moreover, Oppenheimer did not maintain the GNMA certificates for the Abeleses since it is undisputed that the underlying GNMA certificates were not in existence at the time of the purchase."

This is irrelevant for we are not dealing with "GNMA certificates;" we are dealing with securities that are called "GNMA forwards" which are bought and sold in a very active market which is a separate market from that in which "GNMA certificates" are traded.

(7) "On the trade date, Oppenheimer had not purchased the GNMA certificates, and thus did not transfer title to plaintiffs."

This is irrelevant because Oppenheimer purchased "GNMA forwards" from investment bankers, and that is what they sold to the Abeleses. No one here is involved in buying or selling "GNMA certificates." It is comparable to the commodities market when investors trade in futures for soy beans before the soy beans are harvested.

(8) "Next, no extension of credit existed since the plaintiffs had no obligation to pay Oppenheimer the purchase price."

This is incorrect for the Abeleses did have an obligation to pay Oppenheimer for the "GNMA forwards" that they bought on any one of three dates: (1) the date the Abeleses sold the "GNMA forwards;" (2) unbeknownst to the Abeleses, the date the market value of the "GNMA forwards" dropped below what the broker felt to be a safe amount; and (3) the settlement date.

(9) "Plaintiffs' deposit is similar to a performance bond designed to insure that the parties live up to their obligations at a future date."

This is not similar to a performance bond for the Abeleses were not guaranteeing that they would buy the "GNMA forwards." They had already bought them and they had the right to sell them. The Abeleses' deposit was a down payment, and they were given credit for the down payment on their purchase price and the broker extended them credit for the unpaid balance.

(10) "Plaintiffs' deposit was not part of a financing arrangement, and there were no credit charges."

This is untrue. There were no stated credit charges, but in fact, those charges were hidden in the mark-up. The whole purpose of the Rule 10(b)(16) is to require brokers to state these credit terms.

(11) "Since no debt was due on the trade date, there was no deferral of a debt payment and thus, no extension of credit under the TILA."

The Abeleses had a debt which was incurred when they purchased the "GNMA forwards" on the trade date. This debt was payable on any one of three dates, i.e., the date the Abeleses sold the "GNMA forwards," if they did, on the settlement date, or as the Abeleses found out, on the date that Oppenheimer sold them.

In conclusion, since Oppenheimer did in fact extend credit to the Abeleses, they violated Rule 10(b)(16) because they did not disclose the credit terms that they were required to do. For the above reasons, I would grant judgment for the Abeleses. I respectfully dissent.